2022 IL App (1st) 201026-U

FOURTH DIVISION
March 17, 2022

No. 1-20-1026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

|  |  |  |
|---|---|---|
| 2095 STONINGTON, LLC, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 16 CH 11966 |
| VILLAGE OF HOFFMAN ESTATES, | ) ) | |
| Defendant-Appellee. | ) ) | |
| | ) ) ) | Honorable Sophia Hall, Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County where defendant's ordinance which required plaintiff to retrofit its property with an automatic sprinkler system was not unconstitutional as applied.

¶ 2    Plaintiff 2095 Stonington, LLC, the owner of two adjacent commercial properties located in the Village of Hoffman Estates (the property), filed a complaint in September 2016, for declaratory and injunctive relief against defendant Village of Hoffman Estates.  Plaintiff sought a

declaration that an amendment to the Village of Hoffman Estates Municipal Code (Hoffman Estates Municipal Code § 11-1-2(C)(23) (amended Oct. 19, 2015) (providing exceptions to the adopted International Fire Code § 903.2.13.1 (2009)) (the ordinance), which required it to retrofit its property with an automatic sprinkler system, but excluded multiple residence dwellings from the retrofit requirement, was unconstitutional as applied to plaintiff. Specifically, plaintiff alleged that defendant improperly exercised its police power as the ordinance required plaintiff to incur a cost which outweighed the benefit an automatic sprinkler system would provide to the public. Plaintiff further alleged that applying the ordinance to its property violated the equal protection clause of the Illinois Constitution, that the ordinance is unconstitutionally vague, and that applying the ordinance to its property would constitute a taking in violation of the Illinois Constitution. The complaint requested temporary and permanent injunctions enjoining defendant from enforcing the ordinance as to the property.

¶ 3       After a multi-day bench trial, the trial court entered judgment in favor of defendant on all counts. The trial court found that the ordinance advanced a legitimate state interest for the welfare of the public by providing additional safety for the occupants of the property. The trial court further found that plaintiff failed to meet its heavy burden of proof that the ordinance was arbitrary, capricious, or unreasonable.

¶ 4       Plaintiff now appeals arguing the trial court erred when it: (1) improperly applied a balancing test to determine whether the cost of retrofitting its property with an automatic sprinkler system outweighed the benefit to the public; (2) found that the ordinance did not violate the equal protection clause of the Illinois Constitution; and (3) determined that the exercise of defendant's police power nullified plaintiff's inverse condemnation claim. For the reasons which follow, we affirm.

¶ 5                                    BACKGROUND

¶ 6      In September 2016, plaintiff filed a three-count complaint against defendant seeking a

declaratory judgment that the ordinance, which requires commercial buildings to be retrofitted

with automatic sprinkler systems, should not be applied to the property.  Count one sought a

declaratory judgment that the cost of complying with defendant's ordinance outweighed any

benefit to the public, count two sought preliminary and permanent injunctive relief based on a

violation of the equal protection clause of the Illinois Constitution, and count three alleged an

inverse condemnation claim.  The complaint was later amended to add a fourth count alleging

the ordinance was unconstitutionally vague.  The matter proceeded to a bench trial where the

evidence presented by the parties established the following facts.

¶ 7                              The Sprinkler Ordinance

¶ 8      As this controversy involves a decades-old ordinance, we will begin there.  In 1996, the

Village of Hoffman Estates adopted the Building Officials Code Administrators (BOCA), a

national building code, which required automatic sprinkler systems in new buildings.  As BOCA

did not have a retrofit requirement, defendant amended the ordinance to require certain

preexisting buildings to be retrofitted with sprinkler systems.  The ordinance required

compliance by December 31, 2010. James Norris, the Hoffman Estates village manager,

testified at trial that the purpose of the ordinance was to protect public safety and to reduce the

costs associated with fighting fires.  Specifically, Norris testified that having sprinkler systems

installed throughout the community improves the fire department's effectiveness and ability to

respond to emergencies.

¶ 9      Norris further testified that prior to the ordinance being enacted, the village board and its

relevant committees held multiple public meetings to discuss the enactment of a retrofit sprinkler

requirement. A memorandum was distributed to village board members regarding the ordinance which set forth statistics from the National Fire Protection Association indicating a 96.2% rate of effectiveness for sprinkler systems to control or extinguish a fire. The village board was also presented with reports demonstrating that the monetary loss due to fires in buildings without sprinklers was nine times greater than losses in buildings with sprinkler systems.

¶ 10    In May 2002, the village board was presented with a request to amend the ordinance. The Public Health & Safety Committee conducted a series of meetings with individuals representing multi-family complexes within the Village of Hoffman Estates affected by the retrofit requirement. The Committee also held a three-hour meeting with approximately 420 condominium unit owners. The ordinance was amended to exempt multiple family dwellings and churches from having to retrofit with a sprinkler system. This decision was based, in part, upon the cost to residential owners who, unlike commercial property owners, did not receive revenue from the use of their properties. The decision was also based in part on practical issues, such as whether a condominium association could require its owners to install sprinklers within their private residences. In omitting existing residential properties from the retrofit requirement, the village board also considered statistics which demonstrated that fires in commercial buildings could, in fact, be more dangerous than residential fires. The village board enacted the amendment despite the fire department's recommendation against it.

¶ 11    Thereafter, the ordinance was amended on three separate occasions to extend the compliance deadline to accommodate the property owners in the village. In its current form, the ordinance required compliance by December 31, 2016. The applicable version of the ordinance in this case reads as follows:

"903.2.13.1 Mandatory retrofit. Shall be added to read: All existing occupancies

that do not have automatic sprinkler systems installed in accordance with Section 903 of the building code shall retrofit the occupancy with a fire suppression system no later than December 31, 2016, except for multiple family dwellings and their ancillary A, B, and S uses and all buildings and structures which are occupied exclusively for the purpose of worship or other religious services." Hoffman Estates Municipal Code § 11-1-2(C)(23) (amended Oct. 19, 2015).

¶ 12                                         The Property

¶ 13     The property at issue is located at 2095-2119 North Stonington in the Village of Hoffman Estates. Donald S. Craig, plaintiff's property manager, testified regarding the makeup of the property. The property, built in 1971, consists of two multi-unit, single-story commercial buildings and the building space is just under 32,000 square feet. The property was constructed using noncombustible materials with a brick masonry exterior and aluminum framing, windows, and doors. It has a total of 13 rental units, nine of which (at the time of the trial) were rented to tenants. Each unit is separated with a three-hour rated firewall. Two of these firewalls had door-sized holes so as to connect the units. Fire-rated doors were installed to cover these holes. Each unit has three exits: a front exit, a rear exit, and a rear drive-in dock. Two tenants in particular were discussed during the bench trial. The first tenant is a carpet restoration company that stores cleaning chemicals and a truck inside its unit. The second tenant is a manufacturing shop that takes up five of the units of the property. The manufacturing shop operates a propane-powered forklift inside its units.

¶ 14     The property was purchased in 1984 by Stonington Partners, a partnership which was comprised of Donald J. Craig, Leroy Rosasco, and John Igini, with each partner having a one-third interest. At that time defendant did not require the installation of an automatic sprinkler

system. Over time, the interest in the property was exchanged until it was all ultimately transferred to plaintiff in 2016 at which time the limited liability company was created. Donald J. Craig is currently the sole member of the plaintiff-LLC and his son, Donald S. Craig, is the sole manager. As an individual, Donald J. Craig held an interest in the building from 1984 until 2016.

¶ 15    Donald S. Craig further testified regarding the fire safety measures at the property. The property is equipped with a smoke detector system and a fire alarm system linked to the Hoffman Estates Fire Department. Donald S. Craig explained that once a smoke detector activates inside a unit, the alarm system begins emitting a loud noise and strobe lighting to alert all the occupants to the existence of a fire. The fire alarm can only be deactivated by the fire department. There are also manual pull stations which an individual can activate in case of fire. When this occurs, the Hoffman Estates Fire Department is also directly contacted. These fire safety devices were installed in March 2019, just prior to trial in April 2019. Craig also testified that during plaintiff's ownership, the Hoffman Estates Fire Department inspected the property annually and never identified the property as being at risk of a fire. There has never been a fire at the property.

¶ 16                              Finances of Plaintiff

¶ 17    Donald S. Craig testified that the property is the only asset of plaintiff, and that the property is free of any encumbrances. Craig further testified that between 1991 and 2002, five separate loans were issued with the property used as collateral. These loans ranged from $500,000 to $1.5 million. Craig did not know who the loan funds were issued to or how the funds were utilized.

¶ 18    Craig testified that the property did not qualify for a property tax abatement program to

fund the automatic sprinkler system. Plaintiff's insurance would not be decreased if a sprinkler system were to be installed. He was not able to increase tenants' rent because, in his opinion as a property manager, the sprinklers would not affect the value of the units. Craig further testified he made no steps toward obtaining a loan to fund the installation of a sprinkler system using the property as collateral. No testimony was elicited that indicated why no steps were taken toward obtaining a loan.

¶ 19                    Cost of Installing an Automatic Sprinkler System

¶ 20    Plaintiff's witness Scott DiGilio, an expert engineering consultant, testified his company provided plaintiff with two estimates for installing an automatic sprinkler system at the property. The first estimate was delivered in August 2016 and indicated it would cost $434,615. This estimate was, in part, based on the price per square foot being $3.50. This estimate also included the construction of two water rooms and the installation of a new water main to the property. The second estimate was delivered in March 2019 for $573,563. DiGilio testified that the second cost estimate increased in part because of issues he did not identify during his 2016 site visit. For example, he changed the location of the water rooms to a location further away from the parking lot which required him to use a longer water service line. DiGilio also added $30,000 in costs to relocate and protect the contents of the units. In addition, the cost per square foot had increased to $5.50 for unoccupied units and $6.50 for occupied units.

¶ 21    Craig testified that plaintiff did not seek competitive bids for the installation of the sprinkler system, did not attempt to amortize its costs over several years, and did not look for insurance companies that would possibly offer it a reduction in insurance premiums based on the installation of a sprinkler system.

¶ 22                    Appraisal of Property

¶ 23    Michael Marous, who testified as an expert in real estate appraisal, found the value of the property in 2016 to be $1.15 million if the property did not have to comply with the ordinance. If compliance with the ordinance was required, then the property would have a value of $650,000. This value reduction was based on DiGilio's 2016 estimate for the installation of the sprinkler system.

¶ 24                          Fire Safety Expert Testimony

¶ 25    Three experts testified regarding fire safety; plaintiff presented the testimony of Rick Glenn, a fire protection and life safety engineer, and defendant presented the expert testimony of Hoffman Estates' fire chief Patrick Fortunato and Hoffman Estates firefighter Mark Lauder.

¶ 26                          *The Hoffman Estates Fire Department*

¶ 27    Fire Chief Fortunato testified that there are four fire stations located within the Village of Hoffman Estates and each is equipped with a fire truck and an ambulance. The closest fire station to the property in question is located at 1700 Moon Lake Boulevard, which is about one mile away. Due to limited resources of the Village of Hoffman Estates, fire engines and ambulances may need to be utilized in other areas of the village when a fire alarm sounds. Additionally, the ambulance located at the 1700 Moon Lake station is not regularly manned.

¶ 28    Fortunato further testified that when a dispatch is announced at the fire station, firefighters have 60 to 90 seconds to commence driving to the scene. They must obey traffic laws but may exceed the speed limit by 20 miles per hour if it is safe to do so. When they arrive, the firefighters assess the fire from all angles of the exterior of the building. Firefighters never assume a building is vacant. Upon arriving at a scene, they will check the surroundings of the building to search for clues, such as vehicles in the parking lot, to determine whether anyone is inside. Only by conducting a search for signs outside of the building can they tell with certainty

that no one is inside. Once this assessment is made, they then conduct fire suppression first; otherwise, they conduct rescue first. Rescue entails the firefighters entering the building to rescue occupants inside. Fire suppression is the actual fighting of the fire. According to Lauder, once they are on the scene, it takes the firefighters four to five minutes to commence suppressing the fire. Fortunato testified that it may take the fire department between eight and 10 minutes to be actively on-scene at the property fighting a fire. This time may be even longer if the fire truck is on location elsewhere at the time a call comes in, a scenario which occurs almost every day.

¶ 29                              *Fires Within Hoffman Estates*

¶ 30    Fortunato testified that in the last 20 years there have been three fatalities in the Village of Hoffman Estates and these deaths have occurred in residential and multi-residential residences. There have never been any fatalities at commercial properties. Between 2005 and 2017, there have been three injuries sustained in connection with fires at commercial properties, but they all occurred in buildings equipped with automatic sprinklers.

¶ 31                          *Basic Qualities of Fire Safety Systems*

¶ 32    All three experts agreed on the basic qualities of the various fire safety systems. As explained by the experts, a fire alarm system detects smoke in the property and alerts a fire department either by contacting a dispatch center or the fire department directly. The fire alarm system also alerts all the occupants in the building of a fire. The fire alarm installed at the property will alert the occupants with an audible alarm and a flashing strobe light. When activated, the fire alarm connects directly to the Hoffman Estates Fire Department.

¶ 33    An automatic sprinkler system detects heat from a heat source. When the temperature reaches between 155 and 165 degrees Fahrenheit, a bulb breaks inside the sprinkler system and releases water in the particular area where the heat source is detected. Smoke does not activate a

sprinkler system. In addition, an automatic sprinkler system is not designed to be effective when all the sprinkler heads are activated simultaneously. As an example, Glenn testified that if a building equipped with a sprinkler system was subject to arson (where numerous fires are simultaneously set throughout the property), the sprinkler system would not be as effective. The experts further agreed that a sprinkler system protects the life of the occupants of a property as well as the contents inside.

¶ 34    Regarding the interior contents of a property, Lauder testified that certain items would cause the fire load (the intensity of the fire) to increase. Fortunato and Lauder agreed that storing vehicles inside a unit would increase the fire load as would storing a propane-powered forklift. Glenn, on the other hand, testified that storing a vehicle inside a unit would have an insignificant impact because garages are considered to be a low hazard under the fire safety codes. Glenn also opined that storing a propane-powered forklift inside a unit would have no impact because the only hazard would be if one was refueling the tank on the premises.

¶ 35    Fortunato further testified that chemicals may increase the fire load depending on the products and their combustibility or flammability. Lauder testified the more items that are stored in a building increases the fire load. In regard to one of the units of the property, DiGilio testified that it was "jammed packed" with items.

¶ 36                    *Expert Opinions on the Benefits of Sprinkler Systems*

¶ 37    The experts disagreed, however, regarding whether the sprinkler system at the subject property would significantly increase the level of life safety for the property's occupants. Glenn testified that as a fire protection and life safety engineer he is responsible for evaluating new and existing buildings to determine whether they have an adequate level of life safety. Glenn opined that the installation of a sprinkler system at the property would not significantly increase the

level of life safety for the property's occupants. Glenn explained that his opinion was based on the fact that the one-story property was equipped with a fire alarm system that itself provides a higher level of life safety for occupants. This is because the fire alarm would sound throughout the entire property and likely alert the occupants prior to the sprinkler system being activated. In addition, Glenn's opinion was based on the fact that the property was equipped with exits at the front and rear of each unit. Based solely on the layout of the property (and not considering the source of the fire or occupant disabilities), Glenn stated that the distance from the furthest point to either entrance is 50 feet and therefore an occupant could exit the property within 20 seconds. Accordingly, based on his expertise as a fire protection and life safety engineer, once the fire alarm at the property has been activated the occupants would likely have already exited the building before the sprinkler system activated. Additionally, the fire alarm at the property automatically alerts the Hoffman Estates Fire Department and based on its close proximity to the property, in Glenn's opinion the firefighters could arrive anywhere between three to five minutes after the alarm has been activated.

¶ 38    Conversely, Fortunato testified that the sprinkler systems at the subject property would significantly increase the "life safety" of the property's occupants. Fortunato opined that a fire doubles in size every minute. He further opined that an automatic sprinkler system is designed to reduce the size of a fire thus, when activated, the sprinkler system reduces the products of combustion (heat and smoke) and increases the visibility within the structure allowing those individuals inside of the property to exit. It also makes it easier for firefighters to extinguish the fire and complete rescue operations. According to Fortunato, without a sprinkler system a fire that has been combusting for three minutes places the occupants of the property in imminent danger. Fortunato testified that sprinkler systems provide a "tremendous" benefit to occupants of

a property.

¶ 39     Fortunato also testified that a fire alarm system only protects occupants if those individuals listen to the alarm and timely exit the building.  In both Fortunato and Lauder's experience, however, 50 percent of the time building occupants do not obey the fire alarm and remain in the building despite a fire being present.

¶ 40                     *Commercial Properties Versus Multiple Family Dwellings*

¶ 41     The parties offered testimony regarding the impact of the ordinance on the property as compared to multiple family dwellings that are not required to retrofit with sprinklers.  The evidence at trial established that "multiple family" was defined in the Hoffman Estates Municipal Code as being a dwelling having more than two dwelling units.  Plaintiff's expert Glenn testified that there are more fires in multi-family residences than in single-story commercial buildings.  He opined that multi-family residences have an increased danger as residents are more likely to be engaging in fire-related behaviors such as cooking or lighting candles.  In addition, multi-story, multi-family residences are built with combustible materials and individuals sleep there.  Glenn, however, testified that the use of five units at the property for manufacturing purposes placed the property at a moderate risk level for fire.  In addition, Donald S. Craig testified that one of the manufacturing tenants in the building employed 20-40 individuals and operated 24 hours a day.

¶ 42     Defendant's expert Fortunato testified that while the property is constructed with noncombustible materials, that did not necessarily mean that it was less subject to fires.  According to Fortunato, the structure of the property itself generally is not the cause of a fire; it is the content and the occupants inside that are typically the cause of the fire.  Fortunato thus opined that there can still be a loss of life in a masonry building such as the property.  In

addition, Fortunato testified that chemicals and fuel stored inside the property increase the fire load (*i.e.,* how quickly a fire can spread) and make it more dangerous. Fortunato admitted, however, that he did not conduct any statistical analysis on the risk of fire in one-story commercial buildings but could have done so. He also did not conduct any analysis of the fire statistics regarding commercial versus residential buildings in the Village of Hoffman Estates. He did testify that there are more residential fires than there are commercial fires and more residential buildings than commercial buildings in the Village of Hoffman Estates.

¶ 43    Fortunato also testified that he believes the ordinance is too permissive and that sprinkler systems should be installed in all buildings, commercial or residential. Lauder agreed with the statement that, for the purposes of public safety, one-story buildings should be treated the same as multi-story buildings in terms of having a sprinkler system installed. According to Lauder, there are more residential fires in the Village of Hoffman Estates than commercial fires, but both are just as dangerous.

¶ 44                          Trial Court's Decision

¶ 45    After considering the testimony and the evidence presented at trial and having reviewed the parties' written closing arguments, the trial court issued a 25-page written decision finding plaintiff had not met its burden to prove the unconstitutionality of the ordinance. In rendering this decision, the trial court found that automatic sprinkler systems, including those retrofitted into commercial buildings, provided a public safety benefit:

> "[Plaintiff did not] address the evacuation time for occupants with impaired
>
> mobility. [Plaintiff] did not meet the evidence of the real possibility that the Hoffman
>
> Estates' Fire Department [*sic*] would not be available with the necessary equipment at the
>
> time of the fire. Accordingly, this Court finds that [Plaintiff] did not satisfy its burden to

show that the sprinkler system would not supply an added benefit of fire safety for its occupants."

The trial court expressly found that plaintiff "bears a heavy burden in proving that the Ordinance requiring retrofitting of sprinklers in commercial buildings would offer no public benefit. That burden has not been met."

¶ 46    Regarding the cost to retrofit the property with a sprinkler system, the trial court found that plaintiff "failed to prove that requiring it to comply results in an unreasonable exaction as to the cost of installing the sprinkler system as compared to the additional benefit to the public." The trial court further found significant the fact that plaintiff presented no evidence that the unencumbered property was ever offered as security for a loan to finance the installation of the sprinkler system. The trial court thus found that plaintiff failed to prove it could not afford the installation.

¶ 47    The trial court concluded that plaintiff's claim for a due process clause violation failed after applying the balancing test articulated in *Abbate Bros. Inc. v. Chicago*, 11 Ill. 2d 337, 343 (1957). The trial court explained that under the balancing test, the court was to weigh the benefit to the public safety against the property owner's cost of compliance with the ordinance. Applying this test, the trial court found that plaintiff failed to provide sufficient evidence to demonstrate that requiring installation of a sprinkler system in the property does not provide additional public safety benefit. The trial court also found that the cost of implementing the sprinkler system did not outweigh the public benefit.

¶ 48    As to plaintiff's equal protection claim, the trial court found that the purpose of the ordinance was to protect public safety by providing that sprinkler systems be installed to protect people from a fire hazard. Plaintiff failed to satisfy its burden to show there was no conceivable

basis for treating commercial and residential buildings differently for purposes of fire protection from the retroactive installation of sprinkler systems. In so finding, the trial court noted the evidence of the distinctions between commercial and residential properties:

> "Occupants of commercial buildings face additional fire-related risks because commercial properties have a greater possibility of the presence of flammable chemicals than residential properties do. Occupant risk, after a fire erupts, is also increased at commercial properties because firefighters face additional challenges at commercial properties as compared to residential properties. At a commercial property, a firefighter is less likely to have information about the number of occupants who might be in the building, whether some occupants have physical limitations preventing them from easily exiting the building, or whether hazardous materials are stored at the premises. Logically, therefore, this limited information may affect rescue efforts, which impact occupant safety. In addition, occupants at commercial properties are less likely to be familiar with the layout and premises than those at residential properties, which could also hinder their egress."

The trial court concluded that plaintiff failed to prove that residential properties and commercial properties are similarly situated for purposes of fire protection of the occupants and, therefore, plaintiff's equal protection claim failed.

¶ 49    Finally, the trial court denied plaintiff's inverse condemnation claim. In doing so the trial court found that plaintiff failed to meet its burden that (1) the ordinance is arbitrary and unreasonable because it does not advance a legitimate state interest and (2) that the ordinance denies plaintiff economically viable uses of the property.[1] This appeal followed.

---

[1] The trial court also found plaintiff failed to satisfy its burden to prove that the ordinance

¶ 50                                    ANALYSIS

¶ 51    Plaintiff contends that the burden of compliance with the ordinance is so great compared to the public benefit that the ordinance must be held invalid as applied to the property. In support of this contention, plaintiff points to what it believes are various errors made by the trial court in applying the balancing test. Specifically, plaintiff asserts that the trial court (1) improperly required it to demonstrate that it cannot afford to install an automatic sprinkler system at the property and (2) improperly required it to prove that retrofitting commercial buildings with sprinkler systems would offer no public benefit. Plaintiff maintains that, in essence, the trial court did not conduct a balancing test at all and that, accordingly, this court should apply the appropriate balancing test and determine that the ordinance is invalid as applied to the property.

¶ 52    In response, defendant asserts that the trial court erred when it applied the balancing test instead of applying the rational basis test. Defendant explains that because substantive due process rights are implicated in this case, the rational basis test applies. Defendant maintains that because there is a rational basis between its goal to protect the safety and welfare of its citizens and the adoption of the ordinance, then it passes constitutional muster.

¶ 53                              Standard of Review

¶ 54    The issue here is whether the ordinance, as applied, violated plaintiff's due process rights under the Illinois Constitution (Ill. Const. 1970, art. I, § 2). "In construing the validity of a municipal ordinance, the same rules are applied as those which govern the construction of statutes." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Municipal ordinances

was unconstitutionally vague; however, this argument is not raised on appeal.

are presumed constitutional (*Chicago Allis Mfg. Corp. v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 320, 327 (1972)), and the challenging party has the burden of establishing a clear constitutional violation (*People v. One 1998 GMC*, 2011 IL 110236, ¶ 20). A court will affirm the constitutionality of a statute or ordinance if it is "reasonably capable of such a determination" and "will resolve any doubt as to the statute's construction in favor of its validity." *One 1998 GMC*, 2011 IL 110236, ¶ 20.

¶ 55    As the constitutionality of an ordinance presents a legal question, we review the present as-applied challenge *de novo*. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 13. We will, of course, continue to give deference to the trial court's underlying credibility and factual findings, reversing them only if they are against the manifest weight of the evidence. *Id.*

¶ 56                         Facial Versus As-Applied Challenges

¶ 57    Plaintiff here presents an as-applied challenge to the ordinance. To understand the posture of this challenge, it is important to first differentiate between facial and as-applied challenges. In a facial challenge, a court examines whether the statute or ordinance at issue contains "an inescapable flaw that renders the *** statute unconstitutional under every circumstance." *One 1998 GMC*, 2011 IL 110236, ¶ 58. "[A] challenge to the facial validity of a statute is the most difficult challenge to mount successfully because an enactment is invalid on its face only if no set of circumstances exists under which it would be valid." *Id.* ¶ 20. "Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances." (Emphasis in original.) *In re M.T.*, 221 Ill. 2d 517, 536 (2006). "A successful attack voids a statute for all parties in all contexts, and for that reason, findings of facial

- 17 -

invalidity are made only as a last resort." *Walker v. Chasteen*, 2021 IL 126086, ¶ 31. "The invalidity of the statute in one particular set of circumstances is insufficient to prove its facial invalidity." *M.T.*, 221 Ill. 2d at 536-37. " ' "[S]o long as there exists a situation in which a statute could be validly applied, a facial challenge must fail." ' " *Id.* at 537 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 145 (2004), quoting *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002)).

¶ 58    By contrast, in an as-applied challenge, "a plaintiff protests against how an enactment was applied in the particular context in which the plaintiff acted or proposed to act, and the facts surrounding the plaintiff's particular circumstances become relevant." *Napleton*, 229 Ill. 2d at 306. In short, an as-applied challenge "requires a party to show that the statute violates the constitution as the statute applies to him." *In re Deshawn G.*, 2015 IL App (1st) 143316, ¶ 59 (quoting *People v. Brady*, 369 Ill. App. 3d 836, 847 (2007)).

¶ 59    Whether a challenge is a facial or an as-applied challenge affects the scope of our review because the facts of a party's case become relevant only if he or she brings an as-applied challenge. See *Byrd v. Hamer*, 408 Ill. App. 3d 467, 487-88 (2011). As noted, in an as-applied challenge, the challenging party contests only how the statute or ordinance was applied against him or her within a particular context, and, as a result, the facts of his or her particular case become relevant. *Napleton*, 229 Ill. 2d at 306. By contrast, where the challenging party has chosen to mount only a facial challenge, the facts of his or her particular case do not affect our review. The type of challenge also affects the remedy available to a prevailing party. "[I]f a plaintiff prevails in an as-applied claim, he may enjoin the objectionable enforcement of a statute only against himself, while a successful facial challenge voids enactment in its entirety and in all applications." *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 498 (2008). Where a statute or ordinance is constitutional as applied to a party, a facial challenge will also fail, since there is

necessarily at least one circumstance in which the statute or ordinance is constitutional. *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 29.

¶ 60                                    Applicable Test

¶ 61    The first issue we must address is whether the balancing test applies or whether the rational basis test applies. Plaintiff maintains the former test is applicable where it is challenging the constitutionality of the ordinance as to its retroactive application to the property. Defendant, however, maintains that the balancing test is inapplicable because plaintiff came into title of the property when the property was already noncompliant with the ordinance, thus, there can be no issue of retroactivity and the rational basis test applies.

¶ 62    In this instance we agree with defendant that the balancing test does not apply as this case does not involve the retroactive application of the ordinance as to plaintiff. While the evidence demonstrated that Donald J. Craig held some type of ownership of the property since 1984, the ownership of the property was transferred to plaintiff in May 2016. At that time, the property was not in compliance with the long-standing ordinance and plaintiff can be charged with constructive knowledge of this noncompliance. See *Hachem v. Chicago Title Insurance Co.*, 2015 IL App (1st) 143188, ¶ 27 ("Constructive knowledge is knowledge that the law imputes to a purchaser, whether or not he had actual knowledge at the time of conveyance."). Indeed, as plaintiff's sole governing officer, Donald J. Craig had actual knowledge of the ordinance. Consequently, as plaintiff came into title of the property after the enactment of the ordinance, the rational basis test applies.

¶ 63                          *Application of Rational Basis Test*

¶ 64    For purposes of the due process clause, where an ordinance does not regulate a fundamental right, it is subject to rational basis review. *Napleton*, 374 Ill. App. 3d at 1102.

Fundamental rights under due process claims "are limited 'to those that lie at the heart of the relationship between the individual and a republic form of nationally integrated government *** [and] include the expression of ideas (*i.e.,* speech), participation in the political process, interstate travel, and intimate personal privacy interest.' " *Id.* In this case, the parties agree that plaintiff does not claim a fundamental right is at issue. Where a fundamental right is not at issue, then the legislation is subject to rational basis review. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011).

¶ 65    Under rational basis review, an ordinance "does not violate substantive due process protections if it bears a rational relationship to a legitimate governmental purpose and is neither arbitrary nor discriminatory." *Jackson*, 2012 IL App (1st) 111044, ¶ 34. "A rational relationship exists if the challenged legislation, to some degree, tends to prevent some offense or evil or to preserve public health, morals, safety and welfare." *Town of Normal v. Seven Kegs, Two Tappers & Two Barrels*, 234 Ill. App. 3d 715, 720 (1992). Rational basis review is highly deferential to the judgments made by the legislature and the court should "not [be] concerned with the wisdom of the statute or with whether it is the best means to achieve the desired result." *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 125-26 (2004). Therefore, "if there is any conceivable basis for finding a rational relationship, the law in question will be upheld." *Hunt v. Daley*, 286 Ill. App. 3d 766, 771 (1997).

¶ 66    There is no question in this case that there is a rational relationship between requiring the installation of automatic sprinklers and defendant's interest in protecting the health and welfare of its citizens. As it has long been recognized, "[a]ny regulation which tends to lessen the damage and dangers of fires and prevent the spreading thereof in densely populated cities is one which tends toward the protection of life and property of the public, and is therefore, unless

oppressive and unreasonable, a proper exercise of police power." *City of Chicago v. Washingtonian Home of Chicago*, 289 Ill. 206, 216 (1919). Moreover, it was agreed among both parties' experts that automatic sprinkler systems provide a public safety benefit to the occupants within a property, generally.

¶ 67 What is at issue in this case is whether the ordinance is either arbitrary or discriminatory. See *Jackson*, 2012 IL App (1st) 111044, ¶ 34. Plaintiff contends that it is both arbitrary and discriminatory as the ordinance makes irrational distinctions between commercial properties and multi-family dwellings. Specifically, plaintiff observes that while defendant amended the ordinance in 2002 to exclude multi-family dwellings based on cost, such an amendment was not considered for older commercial buildings. Furthermore, plaintiff argues that its particular property did not warrant the installation of an automatic sprinkler system because it is equipped with alternative fire prevention measures and his fire expert, Glenn, testified the construction and layout of the property made the property safer than most.

¶ 68 We find the ordinance is neither arbitrary nor discriminatory. As explained in further detail below, the differences between commercial properties and multi-family dwellings are easily perceived. See *infra* ¶ 81. As demonstrated by the evidence at trial, when a firefighter comes upon a fire at a commercial property there are many unknowns. The firefighter will not know the occupancy of the building, the lay out of the interior of the units, and the potential fire loads within each unit of the property. It is therefore reasonable for defendant to have made a distinction between commercial and multi-family dwellings when enacting the amendment to the ordinance.

¶ 69 Regarding plaintiff's cost argument, we find that plaintiff did not meet its burden to prove that defendant made an arbitrary distinction when it considered the cost of retrofitting

multi-family dwellings and not the cost of retrofitting its commercial property when enacting the 2002 amendment. The evidence established that when enacting the ordinance, the village board members considered detailed memoranda and multiple reports from its fire chief in which he addressed defendant's goals of improving fire safety and doing so in a cost-effective manner in regard to all kinds of properties. Defendant also held community meetings wherein the cost to install sprinkler systems was discussed. In the 1980s the cost of retrofitting a property like the one at issue with a sprinkler system was less than $3.00 per square foot. After the ordinance was passed, defendant—in response to economic conditions facing its citizens—extended the deadline to comply with the ordinance multiple times to allow village property owners time to finance the costs of retrofitting. In total, plaintiff and the previous owners had 20 years to retrofit its property. Moreover, plaintiff's own expert testified that in 2016 the cost to retrofit the property was $3.50 per square foot. It was not until 2019, three years after compliance with the ordinance became mandatory, that the cost per square foot rose to between $5.50 and $6.50. It is evident that plaintiff had ample time to comply with the ordinance and had plaintiff timely complied, it would have been able to do so in a more cost-effective manner.

¶ 70    Furthermore, we agree with the trial court's assessment that plaintiff had the ability to afford a retrofit. Reviewing the evidence set forth in this case, it is plain that the trial court correctly determined that plaintiff failed to satisfy its burden of proof that it cannot afford the installation of sprinklers. Plaintiff's property appraiser, Marous, testified regarding the value of the property as being $1.15 million. Donald S. Craig testified that the property had been utilized as collateral for loans ranging from $500,000 to $1.5 million. No evidence was presented that indicated plaintiff would be unable to obtain similar loans in the future in order to fund the retrofit. Furthermore, we are mindful that plaintiff produced two quotes from the same company

three years apart regarding the cost of retrofitting with a sprinkler system. These quotes ranged from $437,650 to $573,563 and plaintiff never attempted to seek quotes from other companies. The evidence also demonstrated that certain items included in these quotes were not necessarily required by defendant to bring the property into compliance with the ordinance. For example, there was no evidence of the necessity of the two water rooms costing $60,000. Plaintiff has maintained that the cost of the sprinkler system "reduces" the value of its property to $650,000, but that is not the case as the property will continue to retain its market value of $1.15 million should the sprinklers be installed. Accordingly, we agree with the trial court's assessment on this issue.

¶ 71    In conclusion, it is this court's view that the ordinance meets the rational basis test. See *Town of Normal, Two Tappers & Two Barrels*, 234 Ill. App. 3d at 720. It is well established that governing bodies can exercise their police powers to protect public health and safety. See *Town of Normal*, 234 Ill. App. 3d at 720. In the case of fire safety, our case law is clear that public health and safety is paramount. A municipality has the authority to "cause all buildings to be placed in a safe fire condition," including enacting "requirements that retroactively appl[y] to existing buildings." *Alarm Detection Sys., Inc. v. Village of Hinsdale*, 326 Ill. App. 3d 372, 379 (2001). Moreover, "the public has a right to be protected from fire, and a municipality has a duty to provide such protection." *Id.* at 380. While the property at issue is fitted with smoke detectors, a fire alarm system, manual pull stations, and a direct connection to the Hoffman Estates Fire Department, the evidence presented established that more can be done to protect the life and property of the occupants at the property; namely, retrofitting the property with an automatic sprinkler system. There was no dispute that were such a system installed it would benefit the public and offer more protection to the occupants than what is currently installed.

The ordinance, as applied to plaintiff's property, is neither arbitrary nor discriminatory. Accordingly, we find that while the trial court did err in not applying the rational basis test, its ultimate finding was correct—the ordinance is not unconstitutional as applied to plaintiff.

¶ 72                                    Equal Protection

¶ 73    Plaintiff next argues that the trial court erred when it concluded that the ordinance did not violate the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Plaintiff first asserts that the trial court committed reversible error when it failed to construe its argument regarding the ordinance as an as-applied challenge. According to plaintiff, by viewing the argument as a facial challenge, the trial court failed to take into consideration the specific facts pertaining to the property. Second, plaintiff maintains that it presented sufficient evidence demonstrating that there are no true differences in terms of fire safety between the property and multiple family uses. Thus, plaintiff concludes that, based on the evidence presented as it relates specifically to the property, the ordinance's exclusion of multiple family dwellings, but not commercial properties, is arbitrary and violates the equal protection clause of the Illinois Constitution.

¶ 74    Defendant, however, asserts that the trial court correctly determined this issue where the property is not similarly situated to residential properties as commercial properties and residential properties present different types of dangers. Defendant further argues that even if plaintiff presented some argument that commercial and residential properties are similarly situated, the differing treatment between the two is justified where commercial fires are more dangerous to firefighters than residential fires and commercial buildings are open to the public.

¶ 75    In relevant part, article I, section 2 of the Illinois Constitution provides that "[n]o person shall *** be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2. In conducting

an equal protection analysis, we apply the same standards under both the United States Constitution and the Illinois Constitution. *Nevitt v. Langfelder*, 157 Ill. 2d 116, 124 (1993). The guarantee of equal protection requires the government to treat similarly situated individuals in a similar fashion. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322 (1996). Notably, the equal protection clause does not prohibit the legislature from distinguishing groups of people from each another; it only prohibits the distinctions if they are unrelated to the purpose of the legislation. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 116; *Wauconda Fire Prot. Dist. v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 434 (2005).

¶ 76    When undertaking an equal protection analysis there is a strong presumption, absent the presence of an inherently suspect classification or of a fundamental right, that a classification scheme established either by statute or by ordinance is valid. *Szczurek v. City of Park Ridge*, 97 Ill. App. 3d 649, 657 (1981). Here, both parties agree that neither a fundamental right nor a suspect class is present in the instant case. Further, the burden rests with the challenger to demonstrate that the classification is not reasonably related to a stated legislative purpose. *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 518 (1999). A statutory classification will not be declared unconstitutional if any state of facts may reasonably be conceived to justify it. See *McGowan v. Maryland*, 366 U.S. 420, 426 (1961). Because the court may on its own initiative under a rational basis test articulate the facts necessary to justify the statutory classification scheme, the question of whether such a classification violates equal protection has been held to be a question of law for the court to determine. *Szczurek*, 97 Ill. App. 3d at 657.

¶ 77    Plaintiff contends that there is no real and substantial difference between commercial properties and multiple family dwellings that justifies requiring commercial properties to retrofit

with sprinklers and not multiple family dwellings. In plaintiff's view, both are simply properties that have the same level of fire risk.

¶ 78    Defendant disagrees, arguing that the evidence at trial established that commercial properties and multiple family dwellings are not similarly situated. Defendant maintains that because the types of properties are not similarly situated there can be no equal protection violation. Whether commercial properties and multiple family dwellings are similarly situated is a threshold issue. See *Whipple v. Village of North Utica*, 2017 IL App (3d) 150547, ¶ 38 ("The threshold question is whether similarly situated people are being treated dissimilarly.").

¶ 79    We find *Rothner v. City of Chicago*, 66 Ill. App. 3d 428 (1978), to be instructive. In *Rothner*, the officers and directors of 10 nursing homes located in Chicago filed a complaint against the City of Chicago for a declaration that an amendment to the Chicago Municipal Code requiring all nursing homes in the city to provide automatic sprinkler systems was unconstitutional. *Id.* at 429-30. The trial court granted the nursing homes' motion for judgment on the pleadings finding the amended ordinance arbitrarily discriminated against "a single type of Class B Institutional Units, nursing homes, by omitting from coverage all other types of Class B Institutional Units," and declared the amendment unconstitutional as violative of the equal protection clauses of the federal and Illinois constitutions. *Id.* at 430.

¶ 80    On appeal, the *Rothner* court reversed this finding observing that it was "unable to say that the classification invidiously or arbitrarily discriminates against nursing homes." *Id.* at 436. While the nursing homes maintained that the amended ordinance arbitrarily discriminated against nursing homes and other similar institutions such as "homes for the aged, hospitals, infirmaries, nurseries, orphanages, sanatoria, and sheltered care homes," the reviewing court found that the classification was "reasonably and fairly related to the purpose of the amended

ordinance." *Id.* Indeed the reviewing court found that the differences between the institutions was "easily perceived" as each "has characteristics and qualities which are unique to it, as compared with each other institution." *Id.* The reviewing court also relied on evidence that fire disasters are "characteristic of nursing homes, and can be prevented or minimized by the installation of automatic sprinkler systems." *Id.*

¶ 81    As in *Rothner*, we find that the differences between plaintiff's commercial property and multiple family dwellings are "easily perceived." *Id.* Indeed, we agree with defendant that, in this case, the property and multiple family dwellings are not "similarly situated" for the purposes of an equal protection analysis. See *Whipple*, 2017 IL App (3d) 150547, ¶ 38. The evidence presented at trial firmly established the differences between commercial properties and multiple family dwellings. First, commercial properties are leased by businesses or individuals conducting business while multiple family dwellings are typically owned by individuals in their personal capacity. Second, commercial properties are subject to different rules and regulations regarding building and zoning requirements than are multiple family dwellings. Third, the types of activities taking place at commercial properties differ from the types of activities taking place at a multiple family dwelling. For example, the property in this case consists of 13 units. One tenant leases five of these units and is an auto parts manufacturer. This business is open 24 hours a day and employs between 20 and 40 individuals. This business also uses and stores a propane powered forklift on the premises. In comparison, a multiple family dwelling (as defined by the Hoffman Estates Municipal Code) consists of, at a minimum, two separate units and is used as residences where the occupants engage in typical household activities. Based on the record as it relates to plaintiff's specific property, we cannot say that it is so similarly situated to multiple family dwellings so as to meet the threshold requirements of an equal protection

violation. Accordingly, we affirm the trial court's judgment finding that the ordinance did not violate plaintiff's equal protection rights.

¶ 82    In reaching this conclusion we have considered *Ronda Realty Corp. v. Lawton*, 414 Ill. 313 (1953), a case relied on by plaintiff, and find it to be factually inapplicable where it involved a *facial* challenge to a zoning ordinance that sought to remedy street congestion. See *id.* at 315 (observing the circuit court stated "it was deciding the case purely on a question of law and not on questions of fact, and entered its judgment that the section of the ordinance relied upon was unconstitutional" under the equal protection clause). In *Ronda Realty*, the zoning ordinance at issue required apartment buildings to have a certain amount of parking spaces available for its tenants. *Id.* at 315-16. Our supreme court set forth the applicable legal standard as follows: "To be a valid exercise of the police power *** the ordinance must bear a substantial relationship to the public health, safety, comfort or welfare. To those ends, legislative bodies may classify persons if the classification is based on some reasonable distinction having reference to the object of the legislation." *Id.* at 316. The court found that "[t]he evils to be remedied on crowded city streets are well known, but we do not see that the singling out of apartment buildings from other types of buildings embraced by the ordinance is reasonably related to the elimination of those evils." *Id.* at 317. According to the court, "street congestion problems created by boarding or rooming houses, hotels, and the like, are not essentially different from those caused by apartment buildings. All are similarly situated in their relation to the problems of congestion that are cause by parking cars in the street, and all contribute proportionately to the evil sought to be remedied." *Id.* at 318. In this case, however, the evidence established that different fire safety concerns arise when dealing with commercial properties as opposed to multiple family dwellings. Additionally and as previously discussed, there are distinct

differences between the commercial property in this case and multiple family dwellings that warrant differing treatment under the law. Therefore, we find *Ronda Realty* to be inapplicable to the case at bar.

¶ 83                                    Inverse Condemnation Claim

¶ 84    Lastly, plaintiff argues that the trial court erroneously held that plaintiff's inverse condemnation claim could not survive considering its finding that the ordinance was a valid exercise of defendant's police power. Plaintiff asserts that under *Lucas v. S.C. Costal Council*, 505 U.S. 1003 (1992), and *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), a government's exercise of police power does not nullify a claim under the takings clause. Consequently, while defendant is empowered to exercise its police power and enact the ordinance, such an ordinance cannot deprive a property owner of the economic use of his land.

¶ 85    In response, defendant maintains that the evidence demonstrated that—even if plaintiff did not comply with the ordinance—there would be no taking because there would still be value in the property. Moreover, the property was not deprived of all value as the trial evidence established that the property was generating income of $18,000 a month.

¶ 86                                    *Standard of Review*

¶ 87    In this case, plaintiff alleged and tried its inverse condemnation claim under the takings clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 15). "In a claim for inverse condemnation, as opposed to an eminent domain action, the property owner seeks compensation for a taking of private property where a condemnation proceeding has not been initiated." *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 77 (2010).

¶ 88    On appeal before this court, however, plaintiff maintains that we should consider its claim using jurisprudence related to the fifth amendment of the United States Constitution (U.S.

Const., amend. V); namely, *Lucas v. S.C. Costal Council*, 505 U.S. 1003 (1992) and *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). Thus, the first question to address here is whether we may rely on the jurisprudence from the United States Supreme Court in an appeal involving a claim under our state constitution.

¶ 89 Under the "limited lockstep" approach for interpreting cognate provisions of our state and federal constitutions, when the language of the provisions within our constitutions is nearly identical, departure from the United States Supreme Court's construction of the provision will generally be warranted only if we find an indication in the language of our constitution, debates, or committee reports of the constitutional convention that the provisions of our state constitution are to be construed differently than are similar provisions in the federal constitution. *Hope Clinic for Women, Ltd. v. Flores,* 2013 IL 112673, ¶ 47. Thus the question here is whether our state takings clause is nearly identical to that of the United States Constitution.

¶ 90 Authority prohibiting the taking of private property for public use without paying just compensation is found in both the Illinois and United States Constitutions. Specifically, the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V.

¶ 91 The takings clause of the Illinois Constitution of 1970 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." *Id.* Pursuant to this provision, when a governmental defendant takes or damages private property for public use without a condemnation proceeding, the property owner may sue the defendant, in what is known as an inverse condemnation suit, to recover just compensation for the property that has been taken or damaged. *Berry v. City of Chicago*, 2020 IL 124999, ¶ 40; *ProLogis*, 236

Ill. 2d at 77. While the Illinois takings clause reaches beyond the scope of the federal takings clause and provides a remedy for owners whose property is damaged, the part of the clause referring to "[p]rivate property *** taken *** for public use without just compensation" is identical to its federal counterpart. Ill. Const. 1970, art. I, § 15; U.S. Const., amend. V. Thus, our supreme court has traditionally defined a "taking" under the Illinois takings clause in the same way that federal courts define a "taking" under the federal takings clause. See *Hampton v. Metro. Water Reclamation Dist. of Greater Chicago*, 2016 IL 119861, ¶ 25; *Forest Preserve District v. West Suburban Bank,* 161 Ill. 2d 448, 455-58 (1994).

¶ 92     Plaintiff here has never maintained that his property was "damaged" under the takings clause of the Illinois Constitution. Instead plaintiff argued (both in the trial court and in this court) that the ordinance deprived it of the economic use of its land because it was unable to obtain an occupancy permit to lease the unoccupied units at the property to new tenants. Plaintiff's argument thus goes to whether the property was "taken *** for public use without just compensation as provided by law" (Ill. Const. 1970, art. I, § 15). In accordance with our jurisprudence, we will consider the federal takings clause cases—and arguments derived therefrom—as cited by plaintiff. See *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, ¶ 50 (addressing the plaintiff's inverse condemnation claim using the same standard used in federal cases). Determining whether there has been an actionable taking is a question of law. *ProLogis*, 236 Ill. 2d at 77. Thus our review is *de novo. Id.*

¶ 93                                    *Taking*

¶ 94     A taking, in its classic form, occurs when the "government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. Inverse condemnation claims, such as the one here, generally involve regulatory takings. *Kaskaskia Land Co. v.*

*Vandalia Levee & Drainage District*, 2019 IL App (5th) 180403, ¶ 22. The Supreme Court has recognized three types of regulatory takings. See *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). The Court has defined one type of regulatory taking as requiring "an owner to suffer a permanent physical invasion of [his or her] property." *Lingle*, 544 U.S. at 538. Plaintiff here did not suffer a permanent physical invasion of its property, and thus this type of regulatory taking does not apply. The second type of regulatory taking is found in *Lucas*. This taking occurs when a regulation completely deprives an owner of all economically beneficial use of his or her property. *Lucas*, 505 U.S. at 1019; see *Forest Pres. Dist. of Du Page County v. W. Suburban Bank*, 161 Ill. 2d 448, 456-57 (1994) ("Under this standard, only the most severe governmental regulation amounts to a taking requiring just compensation."). This case is not "the 'extraordinary case' in which a regulation permanently deprives property of all value," thus this second type of taking has not occurred. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan Agency*, 535 U.S. 302, 332 (2002).

¶ 95    Our Supreme Court has also recognized a third type of regulatory taking as explained in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). This regulatory taking can occur when the government regulation of private property is so onerous so as to constitute a direct appropriation or ouster that would be compensable. *Lingle*, 544 U.S. at 537. Although there is no " 'set formula' " to apply to regulatory-takings claims, there are "several factors that have particular significance." The factors to consider are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Penn Central*, 438 U.S. at 124; see also *Lingle*, 544 U.S. at 540 ("the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to

which it interferes with legitimate property interests"). At its core, the inquiry turns upon "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540; see *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, ¶ 56.

¶ 96                    Application of the *Penn Central* Factors

¶ 97    Examining the first *Penn Central* factor in conjunction with the facts of this case, we find that the evidence presented at the trial does not sufficiently demonstrate a taking. "But the mere loss of some income because of regulation does not itself establish a taking. Rather, economic impact is determined by comparing the total value of the affected property before and after the government action." *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018).

¶ 98    Plaintiff argues that the only relevant economic impact on the property is its inability to obtain an occupancy permit allowing new tenants to lease units within the property.[2] Donald S. Craig testified that, at the time of trial in 2019, plaintiff was leasing nine out of 13 units at the property for a total rental income of $18,000 a month. He further testified that two tenants were vacating in the upcoming months and therefore seven out of the 13 units would be occupied at that time. No testimony was elicited indicating that the two vacancies at the property were due to the ordinance. In addition, Donald S. Craig admitted that the property was not as desirable as other commercial properties in the area because it was older (it was constructed in 1971) and lacked sought-after amenities. The fact the property is located within Cook County—where

---

[2] We observe that before the trial court plaintiff argued that the ordinance resulted in the total loss of use of the property as defendant would not issue occupancy permits, building permits, or transfer stamps until plaintiff complied with the ordinance. As plaintiff only argues that defendant's failure to issue it occupancy permits have deprived it of the economic use of its property on appeal, we find the remainder of plaintiff's arguments to be forfeited.

taxes are higher than other nearing counties—also deterred potential tenants. Plaintiff elicited no testimony that there were actual tenants who were not able to sign leases due to defendant's failure to grant it an occupancy permit. Instead, Donald S. Craig merely testified that he was "unable" to make any efforts to procure replacement tenants. Plaintiff failed to meet its burden to demonstrate that the ordinance impacted the economic value of the leases at the property.

¶ 99     The next factor to consider is the extent to which the regulation has interfered with distinct investment-backed expectations. See *Penn Central*, 438 U.S. at 124. "To form the basis of a taking claim, a purported distinct investment-backed expectation must be objectively reasonable." *Colony Cove Props., LLC*, 888 F.3d at 452. Such an expectation "implies reasonable probability." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010). "Thus, 'unilateral expectation[s]' or 'abstract need[s]' cannot form the basis of a claim that the government has interfered with property rights." *Bridge Aina Le'a, LLC v. Land Use Commission*, 950 F.3d 610, 633-34 (9th Cir. 2020) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)).

¶ 100   Plaintiff presented no evidence that the ordinance or its compliance with the ordinance interfered with "distinct investment-backed expectations." Donald S. Craig's trial testimony in fact, supported the opposite conclusion—that procuring leases from prospective tenants had actually been difficult for him irrespective of the impact of the ordinance. Furthermore, any argument posited by plaintiff on appeal that the consequences of its noncompliance with the ordinance affected its ability to procure new tenants is too speculative where there is no evidence in the record to support such a conclusion. See *Peters v. Milks Grove Special Drainage Dist. No. 1 of Iroquois County*, 243 Ill. App. 3d 14, 20 (1993) (finding the evidence was too speculative to support an award of damages under the takings clause).

¶ 101    Finally, we consider the third *Penn Central* factor:  the character of the governmental action.  In considering this factor, we look to whether the governmental action amounts to a physical invasion or instead merely affects property interests through " 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124).

¶ 102    No physical invasion by defendant exists in this case.  Instead, the alleged taking is defendant's refusal to provide plaintiff with occupancy permits due to plaintiff's noncompliance with the ordinance.  In this case there was ample evidence that the purpose of the ordinance was to protect the public from potential fires.  Plaintiff does not dispute the trial court's finding that it was within defendant's police powers to enact the ordinance.  It is well-established that "[t]he police power is one of the least limitable of governmental powers, and in its operation often cuts down property rights."  *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946); see, *e.g., Penn Central*, 438 U.S. at 125 (where a State "reasonably conclude[s] that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," compensation need not accompany prohibition); see also *Nollan v. California Coastal Commission*, 483 U.S. 825, 834-835 (1987) ("Our cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest[,]' [but] [t]hey have made clear ... that a broad range of governmental purposes and regulations satisfy these requirements").  In Illinois, we have long recognized that "[e]very owner has the right to use his property in his own way and for his own purposes, subject only to the restraint necessary to secure the common welfare." *Trust Co. of Chicago v. City of Chicago*, 408 Ill. 91, 97 (1951).  Indeed, our supreme court recognized in *Lucas* that "the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate

exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.' " *Lucas*, 505 U.S. at 1027 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). Moreover, where an ordinance is an otherwise valid exercise of a municipality's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592 (1962); *LaSalle Nat. Bank v. City of Highland Park*, 344 Ill. App. 3d 259, 270 (2003). As observed above, the ordinance is a legitimate exercise of defendant's police powers as it is a fire safety regulation designed to protect human life. Thus, the third factor does not support plaintiff's claim.

¶ 103 Considering each of the *Penn Central* factors in conjunction with the facts of this case, we conclude that the ordinance did not constitute an unconstitutional taking as urged by plaintiff.

¶ 104    In reaching this conclusion we have considered the two Illinois cases relied upon by plaintiff: *Byron Dragway, Inc. v. County of Ogle*, 326 Ill. App. 3d 70 (2001), and *Village of West Dundee v. First United Methodist Church of West Dundee*, 2017 IL App (2d) 150278, in support of its argument that even if a municipality enacts an ordinance under its police powers, the municipality still cannot deprive an owner of the economic use of his or her land. While this may be true in some cases, it is not true in this case where the evidence has failed to demonstrate a taking under the *Penn Central* factors.

¶ 105                              CONCLUSION

¶ 106 For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 107 Affirmed.