2020 IL 124999

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124999)

GORDON BERRY *et al.*, Appellees, v. THE CITY OF CHICAGO, Appellant.

*Opinion filed September 24, 2020.*

_____


CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Karmeier, and Theis concurred in the judgment and opinion.

Justices Kilbride, Neville, and Michael J. Burke took no part in the decision.


## OPINION

¶ 1    In January 2017, named plaintiffs, Gordon Berry and Ilya Peysin, filed a two-count amended class-action complaint against the defendant, the City of Chicago (City), on behalf of "all residents of the City of Chicago who have resided in an area where the City has replaced water mains or meters between January 1, 2008, and the present." The complaint raises claims of negligence and inverse

condemnation in relation to the City's replacement of water meters and water main pipes, as well as the partial replacement of lead service lines that run between the water mains and residences throughout the City.[1]

¶ 2       The circuit court dismissed the complaint with prejudice for failure to state a cause of action pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)). On appeal, the appellate court, with one justice dissenting, reversed the dismissal and remanded for further proceedings. 2019 IL App (1st) 180871.

¶ 3       We granted the City's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)) and now reverse the judgment of the appellate court.

¶ 4                                    BACKGROUND

¶ 5       The following facts are alleged in plaintiffs' amended complaint. We accept them as true for purposes of our review. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006).

¶ 6       The City supplies water to its residents in part through water mains and service lines. The water mains are owned by the City and typically run beneath streets in residential areas. The service lines connect the water mains to individual residences. The portion of the service line that lies beneath a resident's property and connects to the home is owned by the resident. The remaining portion, across the property line and closest to the water main, is owned by the City.

¶ 7       Until 2008, approximately 80% of the City's residential service lines were made of lead. Older lead pipes can corrode, resulting in the transfer or leaching of lead particles into the water. This presents a health hazard because lead is a poisonous metal that can be toxic to humans when ingested.

---

[1]The City has recently announced that it will implement a plan to replace lead service lines. See Gregory Pratt, *Chicago's Plan to Replace City's Lead Water Pipes Expected in Coming Weeks, Official Says*, Chi. Trib. (Aug. 19, 2020) https://www.chicagotribune.com/politics/ct-chicago-lead-pipes-replacement-plan-soon-20200819-ifmn2kkdingmxfcujijobm2tae-story.html [https://perma.cc/C9KK-HL5Z]. No suggestion has been made to this court that this announcement renders the present appeal moot.

¶ 8        To reduce the possibility of lead leaching from the service lines, the City treats its water supply with "Blended Polyphosphate." This chemical reacts with lead and forms a protective coating on the inside of the lead pipes, thereby reducing the risk of lead entering the water supply by means of corrosion. This treatment, however, is not foolproof. The protective coating can be compromised when it is disturbed as a result of "construction or street work, water and sewer main replacement, meter installation or replacement or plumbing repairs" or by the rush of water that occurs when the residence's water supply is turned back on following a temporary shutoff.

¶ 9        In addition, there may be a heightened risk of future lead contamination when, during the replacement of a water main, the City-owned portion of a lead service line is replaced with copper or galvanized pipe but the remaining, privately owned portion of the line is left in place. This is because the resulting connection between the new pipe and the old lead pipe triggers a chemical reaction known as galvanic corrosion, a process that occurs when two dissimilar metals come into contact in the presence of water.[2]

¶ 10       In 2008, the City began modernizing its water system by removing and replacing antiquated water meters and more than 900 miles of the City's antiquated water mains. From 2008 through 2013, the City provided no warnings or instructions to residents who might be affected by the modernization projects. Instead, City residents were informed only that they might experience periodic shutoffs of their water while the work was being performed. It was not until September 2013 that the City began instructing affected residents to run all of their faucets for three to five minutes after having their water service turned back on, so as to flush out "sediment, rust, or any lead particulates that may have come loose from [the] property's water service line as a result of the water main replacement."

---

[2]As explained in a 2011 administrative letter from the United States Environmental Protection Agency cited in plaintiffs' complaint,

"[g]alvanic corrosion associated with [a partial lead service line replacement] poses a risk of increased lead levels in tap water by increasing the corrosion rate and/or increasing the chance that corroded lead will be mobilized. This risk may persist for at least several months and is very difficult to quantify with currently available data." Lisa P. Jackson, United States Environmental Protection Agency, *SAB Evaluation of the Effectiveness of Partial Lead Service Line Replacements* (Sept. 28, 2011), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100RNMZ.PDF? Dockey=P100RNMZ.PDF [https://perma.cc/B7RA-YHTW].

¶ 11 Plaintiff Gordon Berry resides in the 5400 block of South Harper Avenue in Chicago. In 1998, the City replaced the water main on his block. In 2009, the City replaced the water meter at his home, which was located outside the front of the home in a small pit or well between the sidewalk and the street. Berry alleges that, when replacing the water meter, the City disturbed the lead service line running to his home, causing the interior protective coating to be compromised, and that the flushing of the water when it was turned back on caused additional displacement of the interior coating. Further, the water meter was reconnected using galvanized iron pipes, which increased the risk of lead corrosion in the service line.

¶ 12 In January 2016, Berry's wife, his son, his son's wife, and his two-year-old granddaughter lived with him at his residence. At that time (approximately 18 years after the water main was replaced and 7 years after his water meter was replaced), a routine checkup revealed that Berry's two-year-old granddaughter had heightened levels of lead in her blood. On February 11, 2016, the City took three samples of the water at Berry's residence. The results showed that the water contained 17.2 parts per billion (ppb) of lead, which is higher than the Environmental Protection Agency's (EPA) recommended lead "action level" of 15 ppb. Berry was not informed of the exact levels of lead; rather, he was told that the water should be retested.

¶ 13 On March 4, 2016, the City collected another 10 samples of drinking water from Berry's residence. These tests revealed levels of lead reaching as high as 22.8 ppb. Berry was not informed of these results until early May 2016, when an investigative reporter informed him that his residence appeared on a list showing addresses where the water supply tested as having "significant" lead content. Berry's water was tested a third time on May 13, 2016. This time the testing showed lead levels ranging from 7.6 ppb to 30.8 ppb in the 10 samples taken. Berry's granddaughter and her parents have since moved out of his home.

¶ 14 Berry continues to use the City-supplied water but has installed water filters in his home in order to eliminate any lead. Plumbers have confirmed that Berry's service line is lead. Replacement of this line, according to quotes Berry received, would cost between $14,000 and $19,000. Berry does not allege that he or any current member of his household is suffering from any physical impairment or dysfunction caused by the ingestion of lead-contaminated water.

¶ 15    Plaintiff Ilya Peysin resides in the 6500 block of North Albany Avenue in Chicago, with his wife and children. In April 2015, the City replaced 2536 feet of water main on North Albany Avenue, which included the water main in front of Peysin's home. In connection with that work, the City sent Peysin a letter advising him to "open all [his] water faucets and hose taps and flush [his] water for 3 to 5 minutes" in order to remove "sediment, rust, or any lead particulates that may have come loose from your property's water service line." Peysin's water was tested by a private firm on October 28, 2016, and the results showed that, after five minutes of flushing, the lead level registered at 5.8 ppb, which was below the EPA action level of 15 ppb but still considered "Significant." The testing firm's report indicated that lead may be leaching into the tap water from the service line, and a plumber confirmed that Peysin's service line is lead. The report further advised Peysin that, although running water for a minute or more before using can help reduce lead exposure, it "will not work" in his case because the lead level in his water was "Significant" or "Serious" after prolonged flushing. Like Berry, Peysin does not allege that he or any current member of his household is suffering from any physical impairment or dysfunction caused by the ingestion of lead-contaminated water.

¶ 16    On January 9, 2017, plaintiffs filed a two-count amended class-action complaint in the circuit court of Cook County. In count I, titled "Negligence," plaintiffs allege that the City has a duty to exercise reasonable care in supplying water to its residents. According to plaintiffs, the City violated this duty when it performed the construction work to replace water mains and meters and when it failed to warn residents about the risks of lead exposure from lead service lines associated with such work. Plaintiffs further allege that the City's negligence "proximately caused Plaintiffs' and the Class members' damages and their increased risk of harm as documented herein." As relief, plaintiffs seek the establishment of "a trust fund *** to pay for the medical monitoring of all Class members" and notification of all class members in writing "that they may require frequent medical monitoring necessary to diagnose lead poisoning."

¶ 17    In count II of plaintiffs' first amended complaint, titled "Inverse Condemnation," plaintiffs allege that the proposed class members own or reside at properties that were "adjacent to construction or street work, meter installation or replacement, or plumbing repairs conducted by [the City]." Further, plaintiffs allege that, during this repair work, the City irreversibly damaged the service lines

of the proposed class by "making them more dangerous." This is because the City used copper and galvanized iron to reconnect the lead service lines owned by the proposed class to the water mains or meters after they were replaced. Plaintiffs allege that this practice caused the lead service lines to corrode "more aggressively than [they] would under normal circumstances," thereby creating a risk that lead would be released into plaintiffs' drinking water supply. As a result, plaintiffs allege that the properties of the proposed class were damaged insofar as they are "more dangerous than before." As relief, plaintiffs seek "compensation for the damage to their lead service lines caused by the City's work" in the amount "necessary to fully replace their lead service lines with copper piping."

¶ 18    The City filed a motion to dismiss plaintiffs' first amended complaint with prejudice, pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2016)). In this motion, the City argued that count I should be dismissed under section 2-615 because plaintiffs failed to allege any injury cognizable in a negligence cause of action. With respect to count II, the City argued that dismissal was required under section 2-615 because plaintiffs had failed to allege any compensable, measurable damage to their water service lines resulting from the City's work. The City then argued that counts I and II should both be dismissed under section 2-619 because both claims are barred by the discretionary immunity conferred on the City under section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201 (West 2016)). Finally, the City argued that count II should be dismissed under section 2-615 because "the law is settled that where a government undertakes actions that benefit all, such as the replacement of water mains, there is no cognizable injury and no inverse condemnation claim."

¶ 19    After a hearing, the trial court dismissed with prejudice both counts of plaintiffs' amended complaint, pursuant to section 2-615. As to count I, the court determined that "[n]o Illinois authority has permitted [recovery for medical monitoring] absent an allegation of a present injury." The court found plaintiffs' claim for medical monitoring was "based solely on a potential risk for future harm" and therefore not recoverable. As to count II, the trial court determined that an inverse condemnation claim requires an allegation of special damage to property in excess of that sustained by the public generally and that the damages alleged by

plaintiffs resulting from the City's work was "borne equally by all residents of the City of Chicago attendant to *** the replacement of lead water mains."

¶ 20      Plaintiffs appealed, and a majority of the appellate court reversed the trial court's dismissal of plaintiffs' amended complaint with prejudice. 2019 IL App (1st) 180871. In so doing, the majority held that, "[v]iewing the complaint in the light most favorable to plaintiffs, they sufficiently allege a present injury due to their consumption of water containing high levels of lead." *Id.* ¶ 34. "Furthermore," the majority continued, "plaintiffs' complaint alleges the need for medical testing due to plaintiffs' consumption of lead-contaminated water." *Id.* According to the majority, because the testing was made necessary by the City's breach of duty, the plaintiffs had sufficiently pled an injury cognizable in a tort action. *Id.* ¶ 35.

¶ 21      As to count II, the majority explained that, under this court's decision in *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, property is considered damaged for purposes of an inverse condemnation claim when there is any direct physical disturbance of a right, either public or private, that an owner enjoys in connection with his property and such right is disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally. 2019 IL App (1st) 180871, ¶ 49. Here, according to the majority, "[t]he dangerous contamination of water coming into plaintiffs' residences, water that is consumed and used by the residents, certainly interferes with the use and enjoyment of their property." *Id.* ¶ 51. Moreover, the majority explained that plaintiffs have alleged "excess damages beyond that experienced by the public generally," namely that "the City's replacement of water mains and meters disrupted the protective coating of their lead service lines, causing harmful levels of lead to leach into their water" and that "the City further damaged their property when it partially replaced lead service lines when reconnecting water service to the newly replaced water mains." *Id.* ¶ 53.

¶ 22      Justice Connors dissented. Unlike the majority, Justice Connors did not read plaintiffs' complaint as alleging that all the proposed class members had consumed lead-contaminated water and were, for that reason, injured. Rather, Justice Connors viewed the complaint as alleging that the City, through its actions in replacing water mains and meters, had created an increased risk that lead would leach from the service lines and enter the residents' water supplies. Understood this way, Justice

Connors concluded that plaintiffs' claim cannot be squared with this court's decision in *Williams v. Manchester*, 228 Ill. 2d 404 (2008), which held that " 'an increased risk of future harm is an *element of damages* that can be recovered for a present injury—it is *not* the injury itself.' " (Emphases in original.) 2019 IL App (1st) 180871, ¶ 69 (Connors, J., dissenting) (quoting *Williams*, 228 Ill. 2d at 425). Accordingly, Justice Connors reasoned that count I did not allege a cognizable injury in a negligence action. Justice Connors also concluded that plaintiffs' negligence claim is barred by both the *Moorman* doctrine and the single-recovery principle. *Id.* ¶¶ 91, 98; see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982). For these reasons, Justice Connors would have affirmed the circuit court's dismissal of count I.

¶ 23    With respect to count II, Justice Connors concluded that plaintiffs' inverse condemnation fails both because plaintiffs' alleged damages are not "special" (2019 IL App (1st) 180871, ¶ 115) but rather "of the same kind as the general public" (*id.* ¶ 116) and because "plaintiffs' alleged damages are of a nature that renders them necessarily incident to the ownership of property" (*id.* ¶ 118). Thus, Justice Connors would also have affirmed the circuit court's dismissal of count II. This appeal followed.

¶ 24                              ANALYSIS

¶ 25    At issue is whether the circuit court properly granted the City's section 2-615 motion to dismiss. A motion to dismiss brought pursuant to section 2-615 of the Code of Civil Procedure challenges the legal sufficiency of a complaint on its face. *Canel v. Topinka*, 212 Ill. 2d 311, 317 (2004). The essential question presented by such a motion is whether the allegations of the complaint, taken as true and construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Id.* Our review of an order granting a section 2-615 motion to dismiss is *de novo*. *Id.* at 318.

¶ 26                         Count I—Negligence

¶ 27    At the outset we clarify the nature of the allegations contained in count I. Plaintiffs do not allege in count I that the City negligently distributed water that

was contaminated with lead at its source. Such an allegation, if proven, would necessarily mean that all residents connected to the City's water system, and all members of a class composed of such residents, received and presumably consumed lead-contaminated water. Instead, plaintiffs allege that the source of lead contamination in this case, if any, was the residents' own individual service lines, disturbed at different times and in different ways as a result of the City's ongoing work to replace antiquated water mains and meters. Importantly, in making this assertion, plaintiffs do not allege that every City resident who is a member of the proposed class does, in fact, have elevated levels of lead in his or her water supply, that every class member has consumed contaminated water, or that it could ever be shown that elevated lead levels exist on a class-wide basis.[3] Rather, plaintiffs' allegations are more general.

¶ 28    Plaintiffs allege that the City's actions in replacing water mains and meters created an increased risk that lead will be dislodged or leach from the residents' individual service lines. From this, plaintiffs contend that all members of the proposed class have been subject to "an increased risk of exposure," *i.e.*, an increased risk that lead will enter their bodies. Plaintiffs state this explicitly at the outset of their complaint, alleging that, "[a]s a result of Defendant's negligent and reckless conduct, Plaintiffs, their children, grandchildren, and the Class are at a significantly increased risk of exposure to a known hazardous substance and lead poisoning." Plaintiffs then confirm that this is the crux of their cause of action for negligence, alleging in the body of count I that "Defendant's negligence proximately caused Plaintiffs' and the Class members' damages and their increased risk of harm as documented herein."

¶ 29    In short, the allegations in count I that are common to the named plaintiffs and all members of the proposed class are that the City's negligent conduct placed them at increased risk of having lead in their water supplies and, therefore, at increased

---

[3]Establishing the actual lead level in an individual residence, let alone multiple residences across a large class, is difficult because the degree to which lead leaches from plumbing materials such as lead service lines, brass faucets, and lead solder "varies greatly with such factors as the age of the material, the temperature of the water, the presence of other chemicals in the water, and the length of time the water is in contact with the leaded material. [Citation.] Indeed, lead levels in samples drawn consecutively from a single source can vary significantly." *American Water Works Ass'n v. Environmental Protection Agency*, 40 F.3d 1266, 1269 (D.C. Cir. 1994).

risk of having lead enter their bodies and of suffering lead poisoning. Based on these allegations, plaintiffs seek to recover the costs of blood testing necessary to detect the presence of lead.

¶ 30     The City, in response, contends that count I of plaintiffs' class-action complaint fails to allege an injury that is cognizable in a negligence action and, therefore, was properly dismissed by the circuit court. As the City observes, a cause of action in tort exists only if the defendant tortfeasor injures or inflicts harm on the plaintiff. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("No injury, no tort, is an ingredient of every state's law."). The City notes that, here, plaintiffs' complaint does not allege that either of the named plaintiffs or any member of the proposed class is suffering from the physical symptoms of lead poisoning. Nor does the complaint allege that anyone is suffering from any physical impairment, dysfunction, or physically disabling consequence caused by the actions of the City.

¶ 31     Further, the City contends that an "increased risk of harm" is not, itself, an injury and, in support, points to *Williams*, 228 Ill. 2d 404. In *Williams*, the plaintiff was involved in a car accident while pregnant. Although the plaintiff's fetus was not injured, the plaintiff herself suffered a broken hip and pelvis. *Id.* at 407-08. Unfortunately, the surgery necessary to address the plaintiff's injuries would have put her fetus at risk, while delaying the surgery would have risked permanent disability for the plaintiff. In addition, the plaintiff's doctors had informed her that radiation from X-rays that had been taken in the hospital could pose a future risk to her fetus. For these reasons, the plaintiff terminated the pregnancy. *Id.* at 408-12. Thereafter, the plaintiff filed a wrongful death action on behalf of the fetus. *Id.* at 412.

¶ 32     Addressing this claim, this court noted that a wrongful death claim is barred if the decedent, at the time of death, would not have been able to pursue an action for personal injuries. *Id.* at 421. Thus, the plaintiff had to establish that her fetus suffered an injury before the pregnancy was terminated. *Id.* at 423-24. The plaintiff asserted that the radiation the fetus received from the X-rays created "an increased risk of future harm," which itself constituted an injury to the fetus. *Id.* at 425. This court rejected that argument, concluding that, even if the X-rays increased the risk of future harm, that was not a "present injury." *Id.* at 427. The court held that "an increased risk of future harm is an *element of damages* that can be recovered for a

present injury" but that such future risk "is *not* the injury itself." (Emphases in original.) *Id.* at 425.

¶ 33    The rule set forth in *Williams*, that an increased risk of harm is not, itself, an injury, is consistent with the traditional understanding of tort law. Almost anything that a person does while living and working in the world can create a risk of harm to others. The long-standing and primary purpose of tort law is not to punish or deter the creation of this risk but rather to compensate victims when the creation of risk tortiously manifests into harm. See, *e.g.*, Oliver Wendell Holmes Jr., *The Common Law* 144 (1881), ("the general purpose of the law of torts is to secure a man indemnity against certain forms of harm to person, reputation, or estate, at the hands of his neighbors, not because they are wrong, but because they are harms"). A person may pursue a cause of action in tort once harm occurs. Given this fact, there is little justification for imposing civil liability on one who only creates a *risk* of harm to others.

¶ 34    Further, there are practical reasons for requiring a showing of actual or realized harm before permitting recovery in tort. Among other things, such a requirement establishes a workable standard for judges and juries who must determine liability, protects court dockets from becoming clogged with comparatively unimportant or trivial claims, and reduces the threat of unlimited and unpredictable liability. See, *e.g.*, *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 14 (N.Y. 2013); *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424 (1997).

¶ 35    In addition to *Williams*, several other decisions from this court recognize that an increased risk of harm is not, for purposes of tort law, an injury. As we recently observed, "The wrongful or negligent act of the defendant, by itself, gives no right of action to anyone. Until the defendant's wrongful or negligent act produces injury to the plaintiff's interest by way of loss or damage, no cause of action accrues." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 29; see also, *e.g.*, *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 443 (1989) ("The dangerousness which creates a risk of harm is insufficient standing alone to award damages in either strict products liability or negligence."); *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 197 (1995) ("A threat of future harm, not yet realized, is not actionable. The wrongful conduct must impinge upon a person."). Given this body of caselaw and because plaintiffs' complaint alleges only that the

City created an increased risk of harm rather than any actual or realized harm, the City contends that no cognizable injury has been alleged and that count I of the complaint was properly dismissed.

¶ 36      Plaintiffs acknowledge the foregoing decisions from this court and expressly concede in their brief "a notion that is not in dispute: increased risk of future harm cannot alone serve as the basis of a claim for damages." Nevertheless, plaintiffs maintain that the present case differs from previous ones because here, plaintiffs have pled a "need for diagnostic medical testing." Plaintiffs contend that the need for medical testing or monitoring is an injury cognizable in a negligence action and, therefore, count I should be permitted to go forward. We disagree.

¶ 37      Simply pleading a need for medical monitoring prompts the question: Why is medical monitoring needed? Plaintiffs themselves allege in their complaint that the need for medical monitoring is based on "their increased risk of harm." Without an increased risk of future harm, plaintiffs would have no basis to seek medical monitoring. In other words, plaintiffs' allegation that they require "diagnostic medical testing" is simply another way of saying they have been subjected to an increased risk of harm. And, in a negligence action, an increased risk of harm is not an injury. See Restatement (Third) of Torts, Liability for Physical & Emotional Harm § 4, cmt. c (2010).

¶ 38      A plaintiff who suffers bodily harm caused by a negligent defendant may recover for an increased risk of future harm as an element of damages, but the plaintiff may not recover solely for the defendant's creation of an increased risk of harm. *Williams*, 228 Ill. 2d at 425. Here, count I of plaintiffs' complaint alleges only that the City caused an increased risk of harm and, therefore, does not allege a cognizable injury for purposes of a negligence action. Accordingly, the circuit court properly dismissed count I.

¶ 39                          Count II—Inverse Condemnation

¶ 40      The takings clause of the Illinois Constitution of 1970 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. 1970, art. I, § 15. Pursuant to this provision, when a governmental defendant takes or damages private property for public use without a

condemnation proceeding, the property owner may sue the defendant, in what is known as an inverse condemnation suit, to recover just compensation for the property that has been taken or damaged. *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 77 (2010).

¶ 41    In this case, plaintiffs' claim for inverse condemnation alleges that the City damaged the proposed class members' property while repairing and updating its water supply system. Specifically, plaintiffs contend that the City, when replacing water mains and meters, used copper or galvanized iron pipes to reconnect residents' lead service lines to the water supply system. Plaintiffs assert that this practice created an increased risk of corrosion in the service lines and, therefore, an increased risk that lead would enter the residents' water supplies. Plaintiffs allege that, in this way, the City's actions damaged "the service lines of Plaintiffs and the class by making them more dangerous." Thus, plaintiffs maintain they have properly pled a claim for inverse condemnation. We disagree.

¶ 42    Property is considered damaged for purposes of an inverse condemnation claim where there is " 'any direct physical disturbance of a right, either public or private, which an owner enjoys in connection with his property; a right which gives the property an additional value; a right which is disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally.' " *Hampton v. Metropolitan Water Reclamation District of Greater Chicago*, 2016 IL 119861, ¶ 27 (quoting *Citizens Utilities Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 25 Ill. App. 3d 252, 256 (1974)); see also *Rigney v. City of Chicago*, 102 Ill. 64 (1881). However, where the physical disturbance does not actually impair the value of the plaintiff's property, "no action will lie." *City of Winchester v. Ring*, 312 Ill. 544, 552 (1924).

> "If the injury amounts only to an inconvenience or discomfort to the occupants of the property *but does not affect the value of the property*, it is not within the provision of the constitution even though a personal action would lie therefor. The injury complained of must also be actual, susceptible of proof and capable of being approximately measured, and must not be speculative, remote, prospective or contingent." (Emphasis added.) *Id.*

See also, *e.g.*, *Illinois State Toll Highway Authority v. American National Bank & Trust Co. of Chicago*, 162 Ill. 2d 181, 194 (1994) (the constitution does not

authorize a recovery if there is no damage, and " 'damages cannot exist if the value of the property is not lessened' " (quoting *Kane v. City of Chicago*, 392 Ill. 172, 177 (1945))); *Pierce v. Northeast Lake Washington Sewer & Water District*, 870 P.2d 305, 311 (Wash. 1994) (*en banc*) (an inverse condemnation action for interference with the use and enjoyment of property will accrue only if the property owner sustains a " 'measurable loss of market value' " (quoting *Highline School District No. 401 v. Port of Seattle*, 548 P.2d 1085, 1091 (Wash. 1976) (*en banc*))); *City of Hazelton v. Daugherty*, 275 N.W.2d 624, 628 (N.D. 1979) ("there cannot be any damage where there is no pecuniary loss").

¶ 43    An allegation that property has been rendered more dangerous by a governmental defendant is "too remote and speculative to be considered as an element of damages to land not taken." *Department of Public Works & Buildings v. Hubbard*, 363 Ill. 99, 104 (1936). Only in certain circumstances, where the creation of such danger "in fact depreciates the value of land not taken" can it be said that the property has been damaged within the meaning of our constitution. *Id.*; see also *Kane*, 392 Ill. at 177 ("The measure of damages is the depreciation in the market value of the property as a whole, caused by a direct physical disturbance of some right incident to its ownership.").

¶ 44    In this case, plaintiffs have alleged only that the City's replacement of water mains and meters has made the proposed class members' property "more dangerous." The concept of "dangerousness" is not susceptible to objective measurement and, thus, cannot by itself be damage under the Illinois takings clause. *Hubbard*, 363 Ill. at 104; *Ring*, 312 Ill. at 552. Further, there are no allegations in plaintiffs' complaint that any property has depreciated in value because of any increased danger caused by the City's work and no allegation that depreciation could be shown across the properties of the entire proposed class.

¶ 45    Plaintiffs' complaint states that they are seeking to have all of the proposed class members' service lines replaced, suggesting, perhaps, that the service lines have all been damaged to the point of being worthless. However, plaintiffs do not, in fact, allege that all the service lines owned by the proposed class members have been rendered completely unusable by the City's actions. Indeed, the complaint notes that plaintiff Berry continues to use City water provided through his service line. Nor do plaintiffs allege that the service lines have been made completely

unusable because they are unfit for human use as a matter of law; there are no allegations in the complaint that any federal or state regulatory rule prohibits the repairs undertaken by the City in this case. In short, plaintiffs' complaint contains no allegation of any measurable, pecuniary loss caused by the City's repair work. Accordingly, "no action will lie" (*Ring*, 312 Ill. at 552) for inverse condemnation. The circuit court therefore properly dismissed count II.

¶ 46                              CONCLUSION

¶ 47        For the foregoing reasons, the judgment of the appellate court is reversed. The judgment of the circuit court dismissing plaintiffs' amended class-action complaint with prejudice is affirmed.

¶ 48        Appellate court judgment reversed.

¶ 49        Circuit court judgment affirmed.

¶ 50        JUSTICES KILBRIDE, NEVILLE, and MICHAEL J. BURKE took no part in the consideration or decision of this case.