2025 IL App (1st) 242397-U

FIRST DIVISION
August 18, 2025

No. 1-24-2397

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CICERO GAS & FOOD, INC., | ) | |
| | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 2023 CH 03923 |
| CITY OF CHICAGO, an Illinois Municipal Corporation, | ) | |
| CHICAGO POLICE DEPARTMENT, and THE | ) | Honorable |
| CHICAGO DEPARTMENT OF BUSINESS AFFAIRS | ) | Joel Chupack, |
| AND CONSUMER PROTECTION, | ) | Judge Presiding. |
| | ) | |
|     Defendants-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Lavin concurred in the judgment.
Justice Pucinski specially concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  The circuit court's section 2-615 dismissal of the plaintiff's amended complaint is affirmed where the plaintiff failed to state a cause of action for inverse condemnation. 735 ILCS 5/2-615 (2020).

¶ 2    The plaintiff, Cicero Gas & Food Inc., is an Illinois corporation that owns a Mobil gas station and grocery store, located at 4804 West Madison Avenue, in Chicago (the business). After

a patron shot and killed another patron at the business, the Chicago Police Department (CPD) issued a summary closure order to the plaintiff, shutting down its business. Following a probable cause hearing, the summary closure order was affirmed by the Chicago Department of Business Affairs and Consumer Protection (DBACP). The business reopened five weeks after the closure pursuant to an agreed nuisance abatement plan between the City of Chicago (the City) and the plaintiff, pursuant to which the plaintiff was required to implement increased security measures at its business. The plaintiff then filed the instant lawsuit against the City, the CPD, and DBACP (collectively the City defendants), alleging, *inter alia*, an inverse condemnation claim. Specifically, the plaintiff asserted that the five-week closure of its business constituted a regulatory taking requiring compensation under the fifth amendment of the United States Constitution (U.S. Const., amend V). The plaintiff now appeals from the circuit court's dismissal of its amended complaint, arguing that the court erred in finding that the five-week closure did not constitute a regulatory taking. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      Before we set forth the procedural history, we first describe the relevant statutory provisions pursuant to which the plaintiff's business was summarily closed. The Illinois Municipal Code allows municipalities to "define, prevent, and abate nuisances." 65 ILCS 5/11-60-2 (West 2020). To this effect, the City's municipal ordinance provides for summary closures of businesses that create a "public nuisance" by way of a "public safety threat." Chicago Municipal Code §4-4-285 (adopted May 6, 2015). Specifically, section 4-4-285 of the ordinance provides that it is "unlawful for any person to operate any establishment in a manner that presents a public safety

2

threat." *Id*. §4-4-285(b).

¶ 5    The ordinance defines a "public safety threat" as:

"the occurrence of all of the following: (1) a violent offense occurs at an establishment during the establishment's operating hours, and (2) the violent offense involves acts of the licensee/owner, or its employees, agents or patrons, or otherwise involves circumstances having a nexus to the operation of the establishment, and (3) the [CPD] superintendent reasonably determines, based on data or information in the superintendent's possession, that continued operation of the establishment presents a danger to the public." *Id*. §4-4-285(a).

Among other things, a "violent offense" is defined as "the killing of a human being by another." *Id*.

¶ 6    Under the ordinance, a "public safety threat" is considered a "public nuisance subject to abatement ***." *Id*. §4-4-285(b). If such a public safety threat occurs there is a "rebuttable presumption" that for "six months after the date on which the public safety threat occurred *** [the] continued operation of the establishment presents a danger to the public." *Id*. The CPD superintendent makes the initial "public safety threat" determination. *Id*. §4-4-285(a), (c). If the "[s]uperintendent determines that an establishment presents a public safety threat, the [s]uperintendent may abate the threat by ordering the summary closure of the establishment," which lasts for a period of up to six months from the date of the underlying violent offense. *Id*. § 4-4-285(c).

¶ 7    An owner or licensee of a subject establishment is entitled to challenge the closure order through a probable cause hearing before the commissioner of DBACP. *Id*. § 4-4-285(e). If, after the hearing, the "[c]ommissioner determines, by a preponderance of the evidence, that a public

safety threat did occur," the commissioner must enter an order authorizing continued closure of the establishment. *Id*. If, on the other hand, the commissioner finds that a "public safety threat" did not occur, the commissioner must enter an order ending the summary closure. *Id*.

¶ 8       Additionally, a business may reopen prior to the expiration of the six-month closure period if the business and the City agree to a nuisance abatement plan. *Id*. A nuisance abatement plan is "any conduct, action, step or acceptance of conditions that is reasonably calculated to prevent the reoccurrence of a public safety threat." *Id*.

¶ 9       In the present case, on March 30, 2023, the CPD superintendent issued a summary closure order for the plaintiff's business after a patron shot another patron there on March 29, 2023. The plaintiff immediately requested a probable cause hearing. The hearing commenced on April 4, 2023, and was completed on April 11, 2023.[1] On April 17, 2023, the DBACP commissioner affirmed the summary closure order. The commissioner found that each of the requirements for a "public safety threat" set forth in section 4-4-285(a) of the City's municipal ordinance were satisfied. Chicago Municipal Code §4-4-285(a) (adopted May 6, 2015). First, the commissioner noted that it was undisputed that a "violent offense"—namely, the March 29, 2023, killing of a patron—"occurred at [the plaintiff's] business establishment during the establishment's operating hours." Second, the commissioner found that the murder was committed by a customer of the business. Specifically, video surveillance footage introduced at the probable cause hearing showed a group of individuals "hanging out outside on the gas station property" and "gambling, drinking from red cups, making purchases inside the gas station, and loitering." These individuals later "surrounded" a car that had pulled into the station after the vehicle's passenger entered the gas station and returned to the vehicle. One person in the group pulled out a handgun and began firing

---

[1] We are without a transcript from that hearing.

into the car, killing the female driver. Finally, the commissioner concluded that it was "more likely than not that continued operation of the establishment present[ed] a danger to the public." Notably, in addition to the March 29, 2023, incident, in the past year, there had been "numerous violent felonies at the establishment and 554 calls for [police] service." *Id*. Accordingly, the commissioner issued an order permitting the closure to remain in effect "for the remainder of the aggregate six-month period."

¶ 10    On April 20, 2023, the plaintiff filed a three-count complaint alleging: (1) a common law writ of certiorari to review the DBACP commissioner's findings; (2) injunctive relief, and (3) an inverse condemnation claim based on the City's regulatory taking of its business. The complaint alleged the following relevant facts. The plaintiff is a law-abiding business, which provides essentials to the community. None of the plaintiff's owners, managers, or employees have ever been accused of any criminal activity. The business is owned and operated by husband and wife, Syed Aiertaz (Syed) and Fatima Batool (Fatima), and is their sole source of income. Syed acts as the business manager. The business employs five workers whose livelihoods also depend on its operation. The business is located in a "high crime area" that is "plagued by heavy gang violence." In the year preceding the summary closure, employees of the business repeatedly requested assistance from the CPD, calling them 554 times. The manager regularly attends "C[hicago] A[lternative] P[olicing] meetings" between the CPD and the community and, at the request of the police, prior to the March 2023 incident, installed video cameras throughout the gas station.

¶ 11    On the morning of March 29, 2023, the plaintiff's employees placed two calls to CPD for assistance, after they unsuccessfully asked several customers to leave. Later that afternoon, at 5:25 p.m. individuals, who had earlier been customers of the business, shot and killed the occupant of a car, which had pulled into the gas station for service. The plaintiff's employees immediately

called the CPD to report the shooting and cooperated with the police in identifying the perpetrators and providing the police with surveillance footage. Nonetheless, on the following morning, the CPD issued the plaintiff a summary closure order, which was subsequently confirmed by DBACP following a probable cause hearing. The plaintiff therefore sought injunctive relief, a review of DBACP's findings, and compensation for the "taking" of its business.

¶ 12    In addition to the complaint, on April 5, 2023, the plaintiff filed an emergency motion for a temporary restraining order (TRO) seeking to reopen its business. The TRO was supported by an affidavit of Syed who attested that since March 31, 2023, the business had lost $160,000 in gasoline sales and $100,000 in grocery sales, such that the plaintiff could not pay the mortgage on the property and owed money to its gasoline supplier. In addition, according to Syed, because of the closure, he and his wife were unable to pay the mortgage on their home.

¶ 13    The plaintiff and the City subsequently entered into an agreed nuisance abatement plan under which reopening was conditioned on the plaintiff implementing certain enhanced security measures at its business, including: hiring armed guards, installing additional lighting, closing the gas station between midnight and 6:00 a.m., maintaining barriers to entering the parking lot when the business was closed, and taking steps to prevent loitering. With the plan in place, the business reopened on May 4, 2023.

¶ 14    The circuit court subsequently granted the City defendants' section 2-619.1 motion to dismiss the plaintiff's complaint. See 735 ILCS 5/2-619.1 (West 2020). The circuit court found that the plaintiff's requests for a common law writ of certiorari and injunctive relief were moot because the plaintiff's business had reopened as part of the negotiated nuisance abatement plan. See 735 ILCS 5/2-619(9) (West 2020). The circuit court also dismissed the plaintiff's inverse condemnation claim for failure to state a cause of action (735 ILCS 5/2-615 (West 2020)) but

granted the plaintiff leave to replead.

¶ 15     On February 22, 2024, the plaintiff filed the instant two-count amended complaint. In count I, the plaintiff renewed its request for a common law writ of certiorari to review the DBACP commissioner's findings but only for the "[p]urpose of [preserving this issue for] [a]ppeal." In Count II, the plaintiff realleged its fifth amendment inverse condemnation claim. This time, the plaintiff alleged that it should receive compensation for the five-week summary closure of its business, which occurred between March 30, 2023, and May 4, 2023. Reyling on the United States Supreme Court decision in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992), the plaintiff argued that it was entitled to compensation because this five-week closure resulted in deprivation of "all economically beneficial use" of its property. Specifically, according to the plaintiff, prior to the shutdown, the business averaged $135,000 in sales and $45,000 in profits per month. During the shutdown, the business lost anywhere between $75,000 to $80,000. In addition, the plaintiff experienced undue hardship because of the abatement plan, which required it to expend additional money for security services "due to the failure or unwillingness" of the CPD to protect it. In addition, during the shutdown, the plaintiff could not pay the $20,000 mortgage on the business and was at risk of foreclosure.

¶ 16     On February 12, 2024, the City defendants filed a section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2020)), arguing that the allegations in the plaintiff's amended complaint failed to establish a regulatory taking. On July 24, 2024, the circuit court granted the City defendants' motion to dismiss. The court reasoned that the plaintiff's inverse condemnation claim failed as a matter of law because the amended complaint alleged a temporary loss of income rather than a "complete deprivation" of property value, and the summary closure order was an appropriate

7

exercise of the City's police power.

¶ 17    The plaintiff filed a motion to reconsider, which was denied. The plaintiff now appeals.

¶ 18                                II. ANALYSIS

¶ 19    On appeal, the plaintiff does not seek review of the DBACP commissioner's decision affirming the summary closure of its business.[2] Instead, the plaintiff solely challenges the dismissal of its inverse condemnation claim, arguing that the five-week closure of its business was an unconstitutional regulatory taking, requiring compensation. For the following reasons, we disagree.

¶ 20    A motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)) attacks the legal sufficiency of a complaint based on defects apparent on its face. *Bogenberger v. Pi Kappa Alpha Corporation, Inc.,* 2018 IL 120951, ¶ 23; *DeHart v. DeHart*, 2013 IL 114137, ¶ 18; *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). The critical inquiry in determining whether dismissal pursuant to section 2-615 is proper is whether the well-pleaded allegations in the plaintiff's complaint, taken as true and construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Bogenberger*, 2018 IL 120951, ¶ 23; *DeHart*, 2013 IL 114137, ¶ 18; *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. Where the facts are insufficient to state a cause of action, dismissal is appropriate. *Gatreaux v. DKW Enterprises, L.L.C.*, 2011 IL App (1st) 103482, ¶ 10. Our review of the circuit court's section 2-615 dismissal is *de novo*. *Bogenberger*, 2018 IL 120951, ¶ 23; *DeHart,* 2013 IL 114137, ¶ 18. In addition, because we "review the judgment, not

---

[2] In this respect, the plaintiff has forfeited this issue for purposes of appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in an appellant's brief are forfeited); see also *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶ 57 (holding that the plaintiff forfeits an issue for review by not raising it on appeal).

the reasoning, of the [circuit] court," we may affirm "on any grounds in the record, regardless of whether the [circuit] court relied on those grounds or whether the [circuit] court's reasoning was correct." *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 24 (citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995)).

¶ 21    In the present case, we are asked to determine whether the allegations in count II of the amended complaint, construed in the light most favorable to the plaintiff, are sufficient to state a cause of action for inverse condemnation. An inverse condemnation claim arises from the takings clause in the fifth amendment of the United States Constitution, made applicable to the states through the fourteenth amendment. U.S. Const., amends. V, XIV. The fifth amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V. The takings clause does not limit the government's ability to acquire private property for public use but rather secures compensation to property owners for such acquisitions. *Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 537 (2005). The purpose is to prevent the " '[g]overnment from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole.' " *Lingle*, 544 U.S. at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). When the government takes private property for public use without a condemnation (*i.e*., an eminent domain) proceeding, the property owner may sue, in what is known as an inverse condemnation suit, to recover just compensation for the property that has been taken. *Berry v. City of Chicago*, 2020 IL 124999, ¶ 40 (citing *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 77 (2010)).[3]

¶ 22    The United States Supreme Court recognizes two distinct categories of takings: physical

---

[3] We note that the Illinois Constitution similarly provides that "[p]rivate property shall not be taken *or damaged* for public use without just compensation as provided by law." (Emphasis added.) Ill. Const. 1970, art. I, § 15. While the

takings and regulatory takings. See *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321-23 (2002). Physical takings, which involve a government entity's occupation or appropriation of "private property for itself or a third party" are governed by a "simple, *per se* rule: The government must pay for what it takes." *Cedar Point*, 594 U.S. at 148. This is true regardless of the size, invasiveness, or intermittent nature of the physical occupation. See *Id*. at 153; see *e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 438 (1982) (holding that requiring landlords to install cables and cable boxes to the outside of apartment buildings, while occupying relatively little space, was a taking); *United States v. Causby*, 328 U.S. 256, 259 (1946) (holding that a taking occurred where the United States Army allowed airplanes to fly at low altitudes over the plaintiff's land for less than 10% of its takeoffs and landings at a nearby airport); *Cedar Point*, 594 U.S. at 148 (holding that a taking occurred where labor union organizers were permitted to enter and

---

Illinois Constitution's takings clause is broader than its federal counterpart since it provides a remedy for property that is damaged, in addition to property that is taken, where there is no allegation that the property was damaged, our supreme court has instructed that a regulatory taking claim be analyzed under the same standard used under the federal constitution. *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶¶ 16, 31. In the present case, the plaintiff nowhere explicitly argues that the summary closure of its business is unconstitutional under the Illinois takings clause. Instead, the appellate brief makes several passing comments regarding the similarity between the Illinois takings clause and its federal or sister-state counterparts. To the extent that this can be construed as the plaintiff's attempt to raise a regulatory taking claim under the Illinois Constitution, because the plaintiff nowhere argues (either on appeal or in the circuit court below) that there was any damage to its property, we will consider the inverse condemnation claim using the same standard applied in federal cases. *Strauss v. City of Chicago*, 2021 IL App (1st) 191977, ¶ 50.

occupy the plaintiff-grower's property, for three hours, 120 days out of the year).

¶ 23    In contrast, where the government "imposes regulations that restrict an owner's ability to use his [or her] own property, a different standard applies." *Cedar Point*, 594 U.S. at 148. In order "[t]o determine whether a use restriction effects a taking," the court applies the "flexible" multi-factor test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), which balances factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. *Id.*; *Tahoe*, 535 U.S. at 321.

¶ 24    The United States Supreme Court has recently clarified that whether a taking is a *per se* physical taking or a regulatory taking does not depend on "whether the government action at issue comes garbed as a regulation," but rather on "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his [or her] own property." *Cedar Point*, 594 U.S. at 149. As such, "[w]henever a regulation results in a physical appropriation of property a *per se* taking has occurred" and the *Penn Central* analysis does not apply. *Id*.

¶ 25    There is only one exception to the application of the *Penn Central* test when it comes to analyzing regulatory takings. Under the United States Supreme Court decision in *Lucas*, where a regulation deprives an owner of "all economically beneficial or productive use" of its property, such that there is a "total regulatory taking," the owner is *categorically* entitled to compensation. See *Lucas*, 505 U.S. at 1026-32.[4] However, the Supreme Court has since clarified that the

---

[4] In *Lucas*, the Supreme Court held that a statute barring the erection of any permanent habitable structures on two beachfront lots purchased by the plaintiff, prior to the enactment of the statute, with the intent to build single-family homes there, constituted a taking because the land had "been rendered valueless." *Lucas*, 505 U.S. at 1017.

categorical rule in *Lucas* applies only to the "extraordinary case in which [the] regulation *permanently* deprives property of all value[.]" *Tahoe*, 535 U.S. at 332. Where a regulation places only temporary restrictions on the use of the property, however, *Lucas* is inapplicable, and *Penn Central* continues to be the proper analysis. *Id*.

¶ 26    In the present case, there can be no doubt that the plaintiff solely asserts a regulatory taking. The amended complaint nowhere alleges a physical appropriation or occupation of the plaintiff's property. Rather, it alleges that the City's five-week summary closure of its business restricted the plaintiff's ability to *use* its property, thereby causing the plaintiff undue financial hardship. It is similarly clear that the categorical rule announced in *Lucas* does not apply. The plaintiff here does not allege that the closure order at issue permanently deprived its property of all value. On the contrary, it alleges that after the five-week summary closure, it reopened and resumed its business. As such, it did not suffer a complete or permanent loss of the ability to do business, so as to trigger *Lucas*. See *Tahoe*, 535 U.S. at 306 (holding that a 32-month moratorium on land development to allow for a study of the impact of all nearby real estate development on the water quality of the lake did not constitute a *per se* taking under *Lucas* because it did not permanently deprive the property of all value). Accordingly, to determine whether the temporary use restriction in this case constitutes a regulatory taking, we must apply the multi-factor test set forth in *Penn Central*.

¶ 27    At the outset, the City defendants assert that the plaintiff has waived review of its inverse condemnation claim under the *Penn Central* analysis because it failed to address this "theory" of regulatory taking in the circuit court below. "[T]he rule of waiver," however, "is a limitation on the parties, not the courts" and we may override such considerations in furtherance of a "just result." *Sigcho-Lopez v. Illinois State Board of Elections*, 2022 IL 127253, ¶ 31, n. 1. We therefore choose to address the application of *Penn Central* test to the facts alleged in the plaintiff's amended

complaint.

¶ 28    As previously observed, to determine whether a restriction on the use of property rises to the level of a regulatory taking requiring just compensation, under *Penn Central*, courts weigh: (1) the economic impact of the regulation on the property owner; (2) the extent to which the regulation has interfered with the owner's distinct investment-backed expectations; and (3) the character of the governmental action. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017); *Lingle*, 544 U.S. at 538-39 (citing *Penn Central*, 438 U.S. at 124); see also *Strauss*, 2021 IL App (1st) 191977, ¶ 56.

¶ 29    A "central dynamic" of the *Penn Central* regulatory takings analysis "is its flexibility," the purpose of which is to "reconcile two competing objectives," namely "the individual's right to retain the interest and exercise the freedoms at the core of private property ownership" and "the government's well-established power to 'adjus[t] rights for the public good.' [Citation.]" *Murr*, 582 U.S. at 394. As the Supreme Court has repeatedly declared: " 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' " *Id*. (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S., 393, 413 (1922)). Accordingly, "[i]n adjudicating regulatory takings cases a proper balancing of these principles requires a careful inquiry informed by the specifics of [each] case." *Murr*, 582 U.S. at 394.

¶ 30    Applying the *Penn Central* factors to the instant case, we find that the plaintiff has failed to state a regulatory taking. While we agree that the plaintiff was significantly impacted by the summary closure order since it lost between $75,000 to $80,000, and risked foreclosure by not being able to pay the $20,000 mortgage on its business, we find that the plaintiff has failed to establish that the remaining two factors tip the balance in its favor. Aside from asserting that it expected to continue to operate its business as usual, the plaintiff does not allege any other specific

investment-backed expectation. Nor could it. "To form the basis of a taking claim, a purported distinct investment-backed expectation must be objectively reasonable." *Colony Cove Properties, L.L.C. v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018). Such an expectation is a "matter often informed by the law in force in the [place] in which the property is located." *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 38 (2012). In other words, the "reasonableness of an expectation may be shaped by" the existing "regulatory regime." *Becker v. City of Hillsboro, Missouri*, 125 F.4th 844, 858 (8th Cir. 2025) (quotation marks omitted).

¶ 31    In the present case, as a business owner in the City, the plaintiff was subject to the requirements of the City's municipal ordinance. As noted above, under section 4-4-285 of that ordinance the City was permitted to summarily close the plaintiff's business to abate a "public nuisance," in this case, a "public safety threat." See Chicago Municipal Code §4-4-285 (adopted May 6, 2015). Because the ordinance was in effect for nearly eight years prior the March 2023 closure of the plaintiff's business, the plaintiff could not have reasonably expected that this provision would not apply. See Chicago City Council, Journal of Proceedings, May 6, 2015, at 108476-83. This is particularly true where the plaintiff admits in its amended complaint that the sustained criminal behavior of certain individuals frequenting its business, for which it repeatedly sought police assistance, ultimately escalated to the murder of one of its patrons. Under these circumstances, the plaintiff cannot plausibly contend that it expected to continue operating normally when doing so posed an obvious risk of harm to its patrons. *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 491 (1987) (" '[A]ll property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community' [citations] and the Takings Clause did not transform that principle to one that requires compensation whenever the [government] asserts its power to enforce it."). To the extent that the

14

plaintiff expected to conduct business as usual after the March 2023 incident, that expectation had to be adjusted. See *Bridge Aina Le'a, L.L.C. v. Land Use Commission*, 950 F.3d 610, 633-34 (9th Cir. 2020) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)) (" '[U]nilateral expectation[s]' or 'abstract need[s]' " are insufficient to "form the basis of a claim that the government has interfered with property rights").

¶ 32    In addition, the character of the government action here strongly weighs in favor of the City defendants. Under the third *Penn Central* factor, an interference with property that "arises from some public program adjusting the benefits and burdens of economic life to promote the common good" generally does not rise to the level of a regulatory taking. *Penn Central*, 438 U.S. at 125. This is particularly true in situations where the government "reasonably conclude[s] that 'the health, safety, morals, or general welfare' would be promoted by prohibiting [a] particular contemplated use[] of" the property. *Id*. Such an exercise of the government's inherent police powers does not require compensation under the fifth amendment. See *Tahoe*, 535 U.S. at 334-35 (pursuant to its inherent police powers, the government may temporarily restrict the use of property without just compensation); *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)) ("It is a traditional exercise of the [government's] 'police powers to protect the health and safety of its citizens.' "); *Lucas*, 505 U.S. at 1027 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S., 393, 413 (1922)) ("[a] property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures *** enacted by the State in legitimate exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power' "); see also *Johnson v. Illinois Department of Professional Regulation*, 308 Ill. App. 3d 508, 512 (1999) (citing *People v. Johnson,* 68 Ill. 2d 441, 447 (1977)) ("The State, pursuant to its inherent police powers may

regulate businesses for the protection of the public health, safety and welfare."); *LaSalle National Bank v. City of Highland Park*, 344 Ill. App. 3d 259, 270 (2003) (citing *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592 (1962)) ("where an ordinance is an otherwise valid exercise of a municipality's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional."). Therefore, "[a]n exercise of police power to prevent a property owner from using his property so as to create a nuisance or a risk of harm to others is not a 'taking' in the constitutional sense." *Village of Lake Villa v. Stokovich,* 211 Ill. 2d 106, 130 (2004) (citing *Lucas*, 505 U.S. at 1030); see also *Cedar Point*, 594 U.S. at 160 ("the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place."); see also *DeBenedictis*, 480 U.S. at 492 n. 22 ("Courts have consistently held that a State need not provide compensation when it diminishes *** the value of property by *** abating a pubic nuisance"); *Kaskaskia Land Company, L.L.C. v. Vandalia Levee and Drainage District*, 2019 IL App (5th) 180403, ¶ 31 ("[r]egulatory action does not constitute a regulatory taking and does not require just compensation if it merely prohibits a use of the property that was already impermissible under existing law, including nuisance principles").

¶ 33     In the present case, it is undisputed that the summary closure order issued pursuant to the City's municipal ordinance was a valid exercise of the City's police powers in abating a public nuisance. The order was clearly an attempt by the City to mitigate the public safety threat that stemmed from the operation of the plaintiff's business. The plaintiff nonetheless asserts that it should not be required to bear the financial burden of the five-week closure of its business alone because it did not create that nuisance. This argument, however, is a red herring. The municipal ordinance, whose validity the plaintiff does not challenge, explicitly permits summary closures of

businesses where the owner does not personally create the safety threat, and instead the threat "involves acts of *** patrons, or otherwise involves circumstances having a nexus to the operation of the establishment." Chicago Municipal Code §4-4-285(a) (adopted May 6, 2015). Here, the CPD superintendent and the DBACP commissioner both found that the safety threat stemmed from the actions of the plaintiff's patrons, and the plaintiff does not challenge that finding on appeal. Moreover, the United States Supreme Court has instructed that a party's "innocence" in creating a public nuisance is irrelevant for purposes of a fifth amendment regulatory taking claim. See *Bennis v. Michigan*, 516 U.S. 442, 453 (1996) (holding that the forfeiture of the wife's interest in property, owned jointly by the husband and wife, was not a taking, where the husband alone used the property in an encounter with a prostitute, thereby violating Michigan's indecency law). Accordingly, the third *Penn Central* factor does not support the plaintiff's claim.

¶ 34    In reaching this conclusion, we have considered the two decisions in *Baker v. City of McKinney*, 84 F.4th 378 (5th Cir. 2023), and *Yawn v. Dorchester County*, 1 F.4th 191 (4th Cir. 2021), relied on by the plaintiff in support of its argument that a taking can be found even if a municipality acts under its police powers, and find them inapposite.

¶ 35    Both *Baker* and *Yawn* involved regulatory taking claims premised on the destruction of property rather than restrictions on use. Specifically, in *Baker*, the police severely damaged the plaintiff's home by using "explosives and toxic-gas grenades" during a hostage crisis, in which the plaintiff was not involved. *Baker*, 84 F.4th at 379-80. Similarly, in *Yawn*, the government's use of pesticides to control the mosquito population in an effort the curb the spread of the Zika virus resulted in the killing of honeybees on the plaintiff's property. *Yawn*, 1 F.4th at 192-93. Unlike in those decisions, here, the plaintiff does not allege any destruction of its property. Instead, as already noted above, it solely asserts that it suffered financial hardship stemming from the City's

17

restriction on the use of its property during the five-week summary closure of its business. Moreover, neither *Baker* nor *Yawn* found that a taking occurred. Instead, the *Baker* court held that because the destruction of the plaintiff's property during the hostage crisis was objectively necessary to prevent imminent harm to another person, the plaintiff therefore had not suffered a taking, and the fifth amendment did not require the police to compensate her. *Baker*, 84 F.4th at 388. Similarly, in *Yawn*, the court found that there was no taking because it was unforeseeable that the government's conduct would cause the death of the honeybees on the plaintiff's property. *Yawn*, 1 F.4th at 195-96. Accordingly, neither decision supports the plaintiff's argument.

¶ 36    We therefore find that the plaintiff has failed to state a regulatory taking under the *Penn Central* test and that the circuit court properly dismissed its inverse condemnation claim.

¶ 37                                    III. CONCLUSION

¶ 38    For these reasons, we affirm the judgment of the circuit court dismissing the plaintiff's amended complaint.

¶ 39    Affirmed.

¶ 40    JUSTICE PUCINSKI, specially concurring:

¶ 41    I reluctantly concur because under the law and precedent, I must.

¶ 42    However, that doesn't mean I think what's the law and what's fair are in synch.

¶ 43    The owners of this property, a "mom and pop" operation, have all their equity tied up in this business.  They have been vigilant about calling the police to stop trouble. They cannot control the neighborhood of their business, but their business provides a necessary service: this isn't a

luxury handbag boutique!

¶ 44    The murder in question happened March 29, 2023.

¶ 45    The CPD summary closure started March 30, 2023.

¶ 46    The hearing took place from April 4 to April 11, 2023.

¶ 47    The business reopened under the Nuisance Abatement Plan on May 4, 2023.

¶ 48    On the face of things, all of this happened pretty quickly, but the net result was still a significant financial loss to this family.

¶ 49    Providing even a temporary nuisance abatement plan, for example, immediately hiring private security guards and immediately reducing operating hours, to allow the business to reopen would have been relatively easy quick fixes and could have been an enormous help to this family.

¶ 50    I hope the city will consider how to add temporary plans to the ordinance involved.